William B. RITCHIE, Appellant,

v.

ORENTHAL JAMES SIMPSON, Appellee.

97–1371 (Opposition Nos. 99,845, 100,431, 101,186 and 101,216).

United States Court of Appeals, Federal Circuit.

March 15, 1999.

William B. Ritchie, pro se, of Concord, New Hampshire.

Before NEWMAN, PLAGER, and RADER, Circuit Judges.

Opinion for the court filed by Circuit Judge PLAGER. Dissenting opinion filed by Circuit Judge NEWMAN.

PLAGER, Circuit Judge.

Applications for federal registration of the trademarks O.J. SIMPSON, O.J., and THE JUICE were filed on behalf of Orenthal James Simpson for use with a broad range of goods, including figurines, trading cards, sportswear, medallions, coins, and prepaid telephone cards. After the marks were approved by an examiner in the United States Patent and Trademark Office ("PTO"), the marks were published in the Official Gazette in accordance with 15 U.S.C. § 1062(a) (1994).

Pursuant to 15 U.S.C. § 1063 (1994), William B. Ritchie filed oppositions to registration of the three marks, asserting that they are not registrable on either of two statutory grounds: first, that the marks are immoral or scandalous matter and should be denied registration under § 2(a) of the Lanham Act, and second, that one of the marks is primarily merely a surname and thus unregistrable under § 2(e)(4) of the Lanham Act. The Trademark Trial and Appeal Board ("Board") dismissed the oppositions, holding that Mr. Ritchie did not have standing to oppose the registrations.[1]

Because the law as properly understood grants standing in an opposition proceeding to a person in Mr. Ritchie's position, we reverse the decision of the Board and remand the case for further proceedings.

A.

The question in this case is not whether the marks, O.J. SIMPSON, O.J., and THE JUICE, constitute immoral or scandalous matter, thus precluding their registration un-

1. *Ritchie v. Simpson*, 41 USPQ2d 1859, 1996 WL 806680 (Trademark Tr. & App. Bd.1997).

der the law. Rather, the issue is the narrower one of whether Mr. Ritchie is entitled to come before the Board and raise that question, that is—whether Mr. Ritchie has "standing" to oppose the registration.

The Board answered the question of Mr. Ritchie's standing in the negative. That answer is in error for two reasons. First, the controlling precedents of this court, as well as the precedents of the Board, are fully consistent with recognizing that someone in Mr. Ritchie's position has standing to oppose a registration on the grounds raised here. Second, this court has recently made clear that the Board, in carrying out its duties under the Lanham Act, may not decide whether a registration is scandalous simply by asserting its own views and values. Instead, the Board has a duty to obtain the views of the affected public. Since Mr. Ritchie alleges that he is such a person, the Board's refusal to give him a hearing is inconsistent with its duty.

### B. Standing to Oppose a Mark

■ Under § 2 of the Lanham Act, a trademark that comprises immoral, deceptive, or scandalous matter which may disparage persons or beliefs is not entitled to registration by the PTO:

§ 2. Trademarks registrable on principal register

No trademark by which the goods of the applicant may be distinguished from the goods of others shall be refused registration on the principal register on account of its nature unless it—

(a) Consists of or comprises immoral, deceptive, or scandalous matter which may disparage or falsely suggest a connection with persons, living or dead, institutions, beliefs, or·national symbols, or bring them into contempt, or disrepute;....

15 U.S.C. § 1052(a) (1994). Whether a mark comprises immoral and scandalous matter is to be ascertained in the context of contemporary attitudes, and the relevant viewpoint is not necessarily that of a majority of the general public, but of a "substantial composite." *In re Mavety Media Group Ltd.*, 33

F.3d 1367, 1371, 31 USPQ2d 1923, 1925–26 (Fed.Cir.1994).

This court has made it clear that the officials of the PTO may not readily assume, without more, that they know the views of a substantial composite of the public. *See id.* In this light, we have commended the practice of resolving the issue of whether a mark comprises scandalous matter by first permitting the mark to pass for publication, and then allowing interested members of a composite of the general public who consider the mark to be scandalous to bring opposition proceedings. *See id.* at 1374, 33 F.3d 1367, 31 USPQ2d at 1928. By so doing, the PTO avoids the risk of pre-judging public attitudes toward a proposed registration based on *ad hoc* responses by government officials, while at the same time affording the affected public an opportunity to effectively participate in the question of whether the registration is proper. *See id.* at 1374, 33 F.3d 1367, 31 USPQ2d at 1928. Thus, the policy behind the procedure for determining whether a mark is scandalous encourages, if not requires, participation by members of the general public who seek to participate through opposition proceedings.

■ In courts created pursuant to Article III of the United States Constitution, a plaintiff must make out a "case or controversy" between himself and a defendant to have standing. *See Warth v. Seldin*, 422 U.S. 490, 498–99, 95 S.Ct. 2197, 45 L.Ed.2d 343 (1975). However, "case" and "controversy" restrictions for standing do not apply to matters before administrative agencies and boards, such as the PTO. *See, e.g., California Ass'n of Physically Handicapped, Inc. v. FCC*, 778 F.2d 823, 826 n. 8 (D.C.Cir.1985) ("The Article III restrictions under which this court operates do not, of course, apply to the FCC. The Commission may choose to allow persons without Article III 'standing' to participate in FCC proceedings."); *Ecee, Inc. v. Federal Energy Regulatory Comm'n*, 645 F.2d 339, 349–50 (5th Cir.1981) ("Administrative adjudications, however, are not an article III proceeding to which either the 'case or controversy' or prudential standing requirements apply; within their legislative mandates, agencies are free to hear actions

brought by parties who might be without standing if the same issues happened to be before a federal court."); *see also* 13A Charles A. Wright, Arthur R. Miller, and Edward H. Cooper, *Federal Practice and Procedure*, § 3531.13, at 80 (1984 & Supp. 1997) ("Administrative agencies are not established under Article III and should not be bound by judicial rules of standing in determining what parties to admit to adjudicatory or rulemaking proceedings, any more than they are bound by other judicial rules of procedure.").

■ Thus, the starting point for a standing determination for a litigant before an administrative agency is not Article III, but is the statute that confers standing before that agency. In the case at hand, the starting point for the standing determination of the opposer is § 13 of the Lanham Act, which provides:

Any person who believes that he would be damaged by the registration of a mark upon the principal register may, upon payment of the prescribed fee, file an opposition in the Patent and Trademark Office, stating the grounds therefor....

15 U.S.C. § 1063.

Section 13 of the Lanham Act establishes a broad class of persons who are proper opposers; by its terms the statute only requires that a person have a belief that he would suffer some kind of damage if the mark is registered. However, in addition to meeting the broad requirements of § 13, an opposer must meet two judicially-created requirements in order to have standing—the opposer must have a "real interest" in the proceedings and must have a "reasonable" basis for his belief of damage.

### 1. The "Real Interest" Test

■ Since the days of our predecessor court, an opposer has been required to show that he has a "real interest" in the outcome of a proceeding in order to have standing. *See, e.g., Universal Oil Prod. Co. v. Rexall*

*Drug & Chem. Co.*, 59 C.C.P.A. 1120, 463 F.2d 1122, 1123, 174 USPQ 458, 459 (C.C.P.A.1972) ("Standing, within the meaning of § 13, is found when the opposer establishes a real interest in the proceeding." (internal citation omitted)); *Tanners' Council of Am., Inc. v. Gary Indus. Inc.*, 58 C.C.P.A. 1201, 440 F.2d 1404, 1406, 169 USPQ 608, 609 (C.C.P.A.1971) ("[A]n opposition may be filed by anyone having a real interest."). This "real interest" requirement stems from a policy of preventing "mere intermeddlers" who do not raise a real controversy from bringing oppositions or cancellation proceedings in the PTO. *See Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 1028, 213 USPQ 185, 189 (C.C.P.A.1982); *see also Tanners' Council*, 440 F.2d at 1406, 169 USPQ at 609; *Singer Mfg. Co. v. Birginal–Bigsby Corp.*, 50 C.C.P.A. 1380, 319 F.2d 273, 276–77, 138 USPQ 63, 66 (C.C.P.A.1963) (An opposer who was not an intermeddler was permitted to oppose a mark.).[2] Pursuant to the "real interest" requirement, to have standing an opposer to a registration is required to have a legitimate personal interest in the opposition. *See Lipton*, 670 F.2d at 1029, 213 USPQ at 189. In other words, the opposer must have a direct and personal stake in the outcome of the opposition.

The Board placed an overly constrictive interpretation on what constitutes a "real interest." According to the Board, a person may only have a "real interest" if he or she has "a personal interest in the proceeding *beyond that of the general public.*" *Ritchie*, 41 USPQ2d at 1861 (emphasis added). The Board supported its interpretation of the "real interest" test by citing *Jewelers Vigilance Committee, Inc. v. Ullenberg Corp.*, 823 F.2d 490, 2 USPQ2d 2021 (Fed.Cir.1987), a case concerning a trade association's standing to oppose a mark. *See Ritchie*, 41 USPQ2d at 1861. In *Jewelers*, 823 F.2d at 492–93, 2 USPQ2d at 2022–23, the "beyond that of the general public" language was paraphrased from language from *Lipton*, 670 F.2d at 1028, 213 USPQ at 188, which itself

---

**2.** Although the specific issue in *Lipton* was a standing determination for a cancellation proceeding pursuant to § 14 of the Lanham Act, due to the linguistic and functional similarities between the opposition and cancellation provisions, respectively §§ 13 and 14 of the Lanham Act, we construe the requirements of those two sections of the Lanham Act consistently. *See Young v. AGB Corp.*, 152 F.3d 1377, 1380, 47 USPQ2d 1752, 1755 (Fed.Cir.1998).

took out of context language in *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972).

In *Sierra Club,* the Supreme Court addressed the issue of whether an interest group that did not allege any injury to its members had standing to prevent a government agency from issuing permits to construct a resort in a national forest. *See id.* The Sierra Club plaintiffs had brought a test case to ascertain whether environmental organizations could represent the public interest without alleging any particular direct interest by its members in the subject matter of the litigation. The Supreme Court said no.

However, despite its holding that an interest group, as such, did not have standing, the Supreme Court emphasized that the categories of injury that establish standing for an individual plaintiff are not limited to injuries that are distinguishable from those suffered by the public:

> The trend of cases arising under the APA and other statutes authorizing judicial review of federal agency action has been toward recognizing that injuries other than economic harm are sufficient to bring a person within the meaning of the statutory language, and toward *discarding the notion that an injury that is widely shared is* ipso facto *not an injury sufficient to provide the basis for judicial review.*

*Sierra Club,* 405 U.S. at 738, 92 S.Ct. 1361 (emphasis added). Furthermore, the Court noted that the fact that particular interests are shared by the many rather than the few does not make them less deserving of legal protection through the judicial process. *See id.* at 734, 92 S.Ct. 1361. Thus, instead of requiring a party to distinguish his injury from that of a large section of the public, the Court only required that the party seeking review must, himself, be among the injured. *See id.* at 735, 738, 92 S.Ct. 1361.

Clearly, the phrase in *Lipton* that suggests a requirement of establishing an interest different from that of the general public is contrary to the Supreme Court's view expressed in *Sierra Club,* which discourages such a comparison. Furthermore, although the "beyond that of the general public" test

for interest level was mentioned in passing in *Lipton,* our predecessor court did not actually compare the interest of the petitioner to that of the general public. *See Lipton,* 670 F.2d at 1028–30, 213 USPQ at 189–90. Instead, our predecessor court discussed the importance of showing a "legitimate personal interest" for establishing standing and emphasized that the Lanham Act grants standing to a broad class of people. *Id.* at 1028–29, 670 F.2d 1024, 213 USPQ at 189.

Similarly, in *Jewelers* this court mentioned the personal interest "beyond that of the general public" test, but did not apply it. *See Jewelers,* 823 F.2d at 493–494, 2 USPQ2d at 2023–24. Instead, this court emphasized that to demonstrate a "real interest," an opposer must show a direct injury to himself. *See id.* at 493, 823 F.2d 490, 2 USPQ2d at 2023–24. Thus, the personal interest "beyond that of the general public" test was merely mentioned in the dicta of *Jewelers* and *Lipton,* but was not actually applied in those cases.

The dissent cites additional cases all of which simply repeat in various contexts the recognized requirement that standing in a Lanham Act opposition requires a real interest. For instance, the dissent cites *United Shoe Mach. Corp. v. Compo Shoe Mach. Corp.,* a case in which the court phrased the real interest test as requiring that the opposer "must have a greater interest than a member of the general public who by such registration *suffers no invasion of his rights and privileges."* 56 F.2d 292, 295, 19 C.C.P.A. 1009 (C.C.P.A.1932) (emphasis added). As the *United Shoe* case illustrates, the statement that an opposer must have an interest greater than the general public meant exactly that – simply being a member of the general public, with no particular interest in or without alleging any interest that might be affected by the registration, was insufficient. The statements in these cases, mostly dicta since the cases typically involved direct commercial interests, merely repeat what was already written.

In no case has this court ever held that one must have a specific commercial interest, not shared by the general public, in order to

have standing as an opposer. Nor have we ever held that being a member of a group with many members is itself disqualifying. The crux of the matter is not how many others share one's belief that one will be damaged by the registration, but whether that belief is reasonable and reflects a real interest in the issue. *See* 15 U.S.C. § 1063.

The Board itself has recognized that standing may be granted to members of a group who make up more than half of the general population. In *Bromberg v. Carmel Self Service, Inc.*, 198 USPQ 176 (Trademark Tr. & App. Bd.1978), the Board granted standing to two persons who were members of the largest segment of the general public, women. The registration at issue was for the mark, ONLY A BREAST IN THE MOUTH IS BETTER THAN A LEG IN THE HAND, for restaurant services. *See id.* at 177. Two women, members of the general public, brought an opposition on the ground that they believed that they would be damaged and defamed by the registration of the mark. *See id.* The opposers alleged that the mark disparaged women as a class, and filed affidavits from various women's groups in support. *See id.*

Over the registrant's objection, the opposers were granted standing. The Board noted that neither the statutes nor the Board's practice permitted class actions. *See id.* at 178. Although women as a class could not bring an opposition, an individual member of the group or a group of individuals could bring such an action. *See id.* The two women were held to be within the zone of those with a real interest in the registration. *See id.* at 179.

In his notice of opposition against the marks at issue, Mr. Ritchie alleged, *inter alia*, that he would be damaged by the registration of the marks because the marks disparage his values, especially those values relating to his family. In addition, in his notice of opposition, Mr. Ritchie described himself as a "family man" who believes that the "sanctity of marriage requires a husband and wife who love and nurture one another," and as a member of a group that could be potentially damaged by marks that allegedly are synonymous with wife-beater and wife-mur-

derer. Furthermore, Mr. Ritchie alleged that the marks are scandalous because they would "attempt to justify physical violence against women."

It would be inconsistent to deny standing to persons in a situation similar to that in *Bromberg* who happen to be members of a different general group, on the grounds that their concerns are widely shared. The Board erred by requiring the opposer in this case to somehow show that his interest is not shared by any substantial part of the general population. On the contrary, the purpose of the opposition proceeding is to establish what a substantial composite of the general public believes. The limitation placed upon standing in this case by the Board undermines this very purpose.

■ For purposes of ruling on a motion to dismiss for want of standing, a reviewing court must accept as true all well-pled and material allegations of the complaint, and must construe the complaint in favor of the complaining party. *See Jewelers*, 823 F.2d at 492, 2 USPQ2d at 2022; *Selva & Sons, Inc. v. Nina Footwear, Inc.*, 705 F.2d 1316, 1320, 217 USPQ 641, 644 (Fed.Cir.1983). Therefore, we must accept as true Mr. Ritchie's belief in a loving and nurturing relationship between husband and wife and the allegation that the marks are synonymous with wife-beater and wife-murderer. Given those assumptions, the potential injury sustained by Mr. Ritchie if the mark is registered is the disparagement of his alleged belief in a loving and nurturing relationship between husband and wife. Thus, Mr. Ritchie, himself, would suffer an injury—disparagement.

We hold that Mr. Ritchie has a real interest, a personal stake, in the outcome of the proceeding and is more than a mere intermeddler and that the fact that his concerns are shared by a large number of people, perhaps even the vast majority of the American public, is in no sense a disqualification of his right to oppose the registration.

2. "Reasonable" Belief of Damage

■ With regard to the question of belief of damage, the Board in *Bromberg*, after finding that the opposers otherwise had

standing, simply concluded that: "Section 13 requires only that an opposer believe that it would be damaged. Establishing such damage is a matter for proof." *Bromberg*, 198 USPQ at 179. However, our precedents suggest something more—that the "belief of damage" required by § 13 of the Lanham Act is more than a subjective belief. *See Universal Oil*, 463 F.2d at 1124, 174 USPQ at 459–60. The belief must have a "reasonable basis in fact." *Id.*

■ For standing purposes, the reasonableness of an opposer's basis for his belief of damage may be shown in several ways. For instance, if an opposer alleges that he possesses a trait or characteristic that is clearly and directly implicated by the proposed trademark, the requisite level of "reasonableness" may be shown. Thus, women, all of whom possessed the traits which were asserted to have been brought into disrepute by the mark at issue in the *Bromberg* case, ONLY A BREAST IN THE MOUTH IS BETTER THAN A LEG IN THE HAND, would by definition establish the reasonableness of their belief of damage. Similarly, Native Americans who possessed the trait which was directly implicated in the proposed mark, REDSKINS, as was the case in *Harjo v. Pro Football Inc.*, 30 USPQ2d 1828 (Trademark Tr. & App. Bd.1994), would also establish the reasonableness of their belief of damage. Thus, one method of establishing the reasonableness of belief of damage for purposes of standing is for the opposer to allege he possesses a trait or characteristic that is clearly and directly implicated in the proposed mark.

■ Recognizing that marks may be offensive to a substantial composite of the public even if they do not implicate particular traits or characteristics, another means that may be used to demonstrate the reasonableness of the opposer's belief of damage is to allege that others also share the same belief of harm from the proposed trademark. For standing purposes, the facts asserted by an opposer need not prove his case on the merits, but should be sufficient to show that the

opposer is not alone in his belief of damage, i.e., the belief is not simply the opposer's subjective view. This evidence may be in the form of surveys or petitions. In addition, affidavits from public interest groups representing people who allegedly share the damage caused by the mark may also supply this objective evidence.

In the case at hand, Mr. Ritchie alleges that the marks possess a connotation such that the marks are offensive to him as a Christian, family man. With regard to evidence of a trait or characteristic that is clearly and directly implicated by the marks at issue, we do not see that as the same kind of immutable trait or characteristic similar to that of women or Native Americans. Therefore, in order to show reasonableness of his belief of damage, Mr. Ritchie must allege other facts establishing that his belief is other than subjective.

In his notice of opposition, at paragraph eight, Mr. Ritchie alleges that he has obtained petitions signed by people from all over the United States who agree with him that the marks at issue are scandalous, denigrate their values, encourage spousal abuse and minimize the problem of domestic violence. Again, for purposes of the motion to dismiss on the pleadings for lack of standing, we accept as true all well-pled allegations. Those allegations are more than sufficient to establish that he has objective proof that he is not alone in believing that he would be damaged if the marks were registered. Therefore, Mr. Ritchie's belief of damage, for purposes of the motion, has a reasonable basis in fact.

The dissent misconstrues the issue as being one of the morals of the applicant. Mr. Simpson's morals are not the issue in this proceeding. The ultimate question the PTO must decide is whether the use of O.J. SIMPSON, O.J., and THE JUICE on a broad range of goods in the public market place "comprises immoral, deceptive, or scandalous matter which may disparage ... beliefs ... or bring them into ... disrepute." [3] *See* 15 U.S.C. § 1052(a). This is a question

---

**3.** Mr. Ritchie has also raised the question of whether one of the marks is primarily a sur-

name, and thus unregistrable.

of public perception, not private morals or even private conduct. Since the issue is one of public perception, the perception of a "substantial composite" of the public, and since Mr. Ritchie properly alleges both a real interest and a reasonable shared belief on behalf of himself and others, the dissent's repeated concern with what may be seen as the personal offensiveness of Mr. Simpson is beside the point.

 The dissent also expresses at some length concerns about Mr. Simpson's First Amendment rights. The dissent fails to understand that the denial of federal registration of a mark does not prohibit the use of that mark. Although the mark holder who is denied federal registration will not receive the benefits conferred on a federal trademark registrant, the mark holder may and can continue to use the mark.

Be that as it may, the Constitutional issue has not been raised or considered below, nor has it been briefed or argued before this court. Congress has chosen to draw a line making certain offensive trademarks nonregistrable under federal law. Until such time as the constitutionality of these Lanham Act provisions is challenged and found wanting, our job is to apply the law as it is written.

Mr. Ritchie's pleadings demonstrate the required "real interest" in the outcome of the opposition, and that his "belief of damage" has a reasonable basis in fact. Thus, it was erroneous to dismiss Mr. Ritchie's opposition. Of course, a petitioner's allegations alone do not conclusively establish standing. If challenged, the facts alleged which establish standing are part of the petitioner's case, and, as we said in *Lipton,* must be affirmatively proved. *Lipton,* 670 F.2d at 1028.

## CONCLUSION

We reverse the Board's decision to dismiss Mr. Ritchie's opposition and remand the case for further proceedings.

## COSTS

Each party to bear its own costs.

*REVERSED AND REMANDED.*

PAULINE NEWMAN, Circuit Judge, dissenting.

I respectfully dissent. Mr. Ritchie has not established his standing to oppose these registrations. A person with no interest in the trademarks for which registration is sought—a "mere intermeddler," *Lipton Industries,* a "self-appointed guardian of the register," *Selva & Sons*—does not meet even the minimal statutory requirements of 15 U.S.C. § 1063. The Lanham Act was not designed to convert federal trademark proceedings into a forum for attack on the morality of the registrant. Disapproval, by a member of the general public, of the applicant for registration, however notorious that applicant, does not provide standing to oppose registration of the applicant's commercial trademarks.

The panel majority, expressing concern lest a trademark examiner exercise moral judgment, instead opens federal agency procedures to satellite litigation initiated by any person who disapproves on moral grounds of the applicant for registration and alleges that others may share his disapproval. The panel majority has created a dangerous and facile opportunity for the intermeddling public to burden commercial rights in which it has no interest, contravening the precedent of this court and the Supreme Court. In addition, this intrusion into commercial speech, through the federal trademark registration process, raises grave issues of constitutional dimension. Thus I must, respectfully, dissent.

### A

The trademark opposition procedure has a useful and indeed necessary purpose, for it provides a mechanism for correction of an inadequacy that is inherent in the trademark examination process. It is clear that the agency search files can not contain every trademark and service mark in this vast commercial nation. Thus the Lanham Act, like its predecessor trademark statutes, authorizes any person who "believes he would be damaged" by a registration, 15 U.S.C. § 1063, to bring his or her concerns before the agency.

The opposer must have an interest in the trademark such that its registration to another would damage the opposer. Precedent has explored the nature of this interest, and has established that the opposer must have a "real interest" in the proceeding, *Lipton Industries, Inc. v. Ralston Purina Co.,* 670 F.2d 1024, 1028, 213 USPQ 185, 188 (C.C.P.A.1982), a "personal interest in the outcome of the case beyond that of the general public," *Jewelers Vigilance Committee, Inc. v. Ullenberg Corp.,* 823 F.2d 490, 493, 2 USPQ2d 2021, 2023 (Fed.Cir.1987). Applying this established precedent, the Board required Mr. Ritchie to show that he has a personal interest in the outcome beyond that of the general public. Since he filed the opposition as a member of the general public (a "family man") the Board correctly held that the requisite showing was not made. The panel majority, now discarding decades of precedent, holds that a member of the general public can oppose the registration of trademarks owned by a person he finds offensive, provided only that he alleges that other members of the general public share his view.

The requirement that an opposer have an interest in the registration beyond that of the general public did not originate with *Jewelers Vigilance* or *Lipton Industries,* as the panel majority implies in now suggesting that these oft-cited cases spoke mere *dicta.* This requirement was part of our jurisprudence long before and indeed well after these cases. It has been steadfastly applied by the Federal Circuit, the Court of Customs and Patent Appeals, and the Trademark Trial and Appeal Board. *See, e.g., Books on Tape, Inc. v. The Booktape Corp.,* 836 F.2d 519, 520, 5 USPQ2d 1301, 1302 (Fed.Cir.1987) ("Petitioner, a competitor of respondent, clearly has an interest in the outcome beyond that of the general public and has standing"); *International Order of Job's Daughters v. Lindeburg & Co.,* 727 F.2d 1087, 1092, 220 USPQ 1017, 1020 (Fed.Cir.1984) ("Lindeburg has clearly demonstrated a 'real interest' in this cancellation proceeding. The allegations which Lindeburg made in its petition for cancellation regarding its longtime production and sale of merchandise with the Job's Daughters emblem are fully supported"); *Selva & Sons,*

*Inc. v. Nina Footwear, Inc.,* 705 F.2d 1316, 1326, 217 USPQ 641, 648 (Fed.Cir.1983) (cancellation petitioner demonstrated "real interest" by alleging its mark was confusingly similar to registered trademark); *Otto Roth & Co. v. Universal Foods Corp.,* 640 F.2d 1317, 1319–20, 209 USPQ 40, 41–42 (C.C.P.A. 1981) (personal interest may arise from manufacture or sale of similar goods); *Federated Foods, Inc. v. Fort Howard Paper Co.,* 544 F.2d 1098, 1100–01, 192 USPQ 24, 27 (C.C.P.A.1976) ("A party has standing to oppose within the meaning of '13 if that party can demonstrate a real interest in the proceeding.... Opposer's real commercial interest in protecting its registered marks is manifest"); *Vick Chemical Co. v. Thomas Kerfoot & Co.,* 80 F.2d 73, 77, 27 USPQ 393, 398 (C.C.P.A.1935) (cancellation petitioner must have "greater interest than a member of the general public"). In *United Shoe Machinery Corp. v. Compo Shoe Machinery Corp.,* 56 F.2d 292, 12 USPQ 246 (C.C.P.A. 1932), the court explained that while the opposition provision was intended to be liberally construed, it did not eliminate the requirement of an interest in the trademark beyond that of the general public:

> Sections 6 and 13 of [the Trademark Act of 1905] under which these proceedings were instituted, provide, respectively, that any one may oppose the registration of a mark "who believes he would be damaged by the registration" and that any person may apply at any time for cancellation whenever he "shall deem himself injured by the registration of a trade-mark in the Patent Office." ...

> These provisions are very broad, and should be broadly construed. *Of course, Congress did not mean to grant these rights to a mere intermeddler, to one who had no interest in the use of the term,* and thereby authorize such a person to interfere in the affairs of others and in the business of the Patent Office. Certainly the person seeking to cancel a registration or oppose an application for registration *must have a greater interest than a member of the general public who by such registration suffers no invasion of his rights and privileges.*

*United Shoe,* 56 F.2d at 295, 12 USPQ at 249 (emphases added.)

The Trademark Trial and Appeal Board has frequently applied this rule, determining, upon highly diverse facts, whether there exists a real interest. A sampling of Trademark Trial and Appeal Board cases illustrates the wide acceptance and continuing application of this rule. *See, e.g., Universal City Studios Inc. v. Cleveland Museum of Natural History,* 39 USPQ2d 1382, 1384, 1996 WL 414085 (TTAB 1996) (opposer, although not manufacturing or selling the identical goods, has "personal interest in the outcome of the case beyond that of the general public"); *Stocker v. General Conference Corp. of Seventh-Day Adventists,* 39 USPQ2d 1385, 1387 n. 4, 1996 WL 427638 (TTAB 1996) (members of denomination have "real interest in the proceeding" to cancel registration of their denomination's name; "the record establishes each petitioner's interest in the case beyond that of the general public"); *Nabisco Inc. v. Wm. Wrigley Jr. Co.,* 40 USPQ2d 1251, 1255, 1995 WL 901930 (TTAB 1996) ("In order to establish standing, a party must plead and prove a 'real interest' in the case, that is, a personal interest in the outcome of the proceeding beyond that of the general public or a mere intermeddler"); *Order of Sons of Italy in America v. Profumi Fratelli Nostra Ag,* 36 USPQ2d 1221, 1223, 1995 WL 596839 (TTAB 1995) (damage to personal reputation meets the "Federal Circuit [standard] that an opposer need only show 'a personal interest in the outcome of the case beyond that of the general public' "); *Harjo v. Pro Football Inc.,* 30 USPQ2d 1828, 1830, 1994 WL 262249 (TTAB 1994) (in cancellation proceeding, Native Americans have a personal interest beyond that of the general public in contesting trademark asserted to be disparaging to them as Native Americans); *Aries Systems Corp. v. World Book Inc.,* 26 USPQ2d 1926, 1930 n. 12, 1993 WL 222336 (TTAB 1993) ("applicant has an interest in this controversy beyond that of the general public"); *Kelly Services Inc. v. Greene's Temporaries Inc.,* 25 USPQ2d 1460, 1462, 1992 WL 430461 (TTAB 1992) ("real interest in the proceeding, that is, an interest beyond that of the general public"); *Estate of Biro v. Bic Corp.,* 18 USPQ2d 1382, 1384, 1991 WL 325858 (TTAB 1991) (estate of inventor, opposing registration of his name as a trademark for his invention, "has a personal interest in the outcome of this case beyond that of the general public"); *Aruba v. Excelsior Inc.,* 5 USPQ2d 1685, 1686, 1987 WL 123878 (TTAB 1987) (Commonwealth of Aruba has a "real interest in the outcome of [the] case beyond that of the general public" to oppose the mark "Aruba" for swimwear); *Intersat Corp. v. Int'l Telecommunications Satellite Organization,* 226 USPQ 154, 155, 1985 WL 72067 (TTAB 1985) ("The purpose of the requirement of standing is to avoid litigation where there is no real controversy between the parties. That is to say, the standing requirement weeds out 'intermeddlers' from those with a 'personal interest in the outcome beyond that of the general public' "); *Bromberg v. Carmel Self Service, Inc.,* 198 USPQ 176, 179, 1978 WL 21770 (TTAB 1978) (women have standing to oppose registration of a trademark derogatory to them as women).

Precedent has not departed from the requirement that an opposer have a personal interest in the outcome of the case beyond that of the general public. This requirement, while liberally construed, has not, until today, been negated. The ruling of the panel majority also misapplies the Supreme Court's decision in *Sierra Club v. Morton,* 405 U.S. 727, 92 S.Ct. 1361, 31 L.Ed.2d 636 (1972), wherein the Court reinforced the requirement of a personal interest in administrative action beyond that of the general public. The Sierra Club, asserting a "special interest in the conservation and sound maintenance of the national parks," had sought to restrain the Department of the Interior from approving a skiing development in the Sequoia National Forest. While the Court recognized that a person may acquire standing through injury other than economic harm, the Court cautioned that "broadening the categories of injury that may be alleged in support of standing is a different matter from abandoning the requirement that the party seeking review must himself have suffered an injury." The Court denied standing to the Sierra Club, explaining:

The requirement that a party seeking review must allege facts showing that he is himself adversely affected does not insulate executive action from judicial review, nor does it prevent any public interests from being protected through the judicial process. It does serve as at least a rough attempt to *put the decision as to whether review will be sought in the hands of those who have a direct stake in the outcome.* That goal would be undermined were we to construe the APA to authorize judicial review at the behest of *organizations or individuals who seek to do no more than vindicate their own value preferences* through the judicial process.

405 U.S. at 740, 92 S.Ct. 1361 (emphases added). *Sierra Club* supports the rule of *United Shoe* and the many subsequent cases that bind us, requiring an opposer to have a personal interest beyond that of the general public. On these solidly entrenched criteria, Mr. Ritchie has not established his standing to oppose the registration of these trademarks.

## B

Mr. Ritchie states that he opposes these registrations because he disapproves of Mr. Simpson's morality and therefore of the "reprehensible" connotations of his name. Our view of Mr. Simpson's morality is as irrelevant as Mr. Ritchie's view, and lends no weight to the asserted standing to oppose registration of these trademarks. Neither Mr. Ritchie nor this court has legal right, moral authority, social responsibility, or judgmental power, to intrude into commercial trademark rights based on moral disapproval of the trademark owner. The Board analyzed the consequences of permitting Mr. Ritchie to contest the registrations as follows:

If we were to find that the present opposer has standing based on the allegations in his pleadings ... [t]hat would seem to open the way for any individual to challenge the registration of an individual's or corporation's trademark or service mark, where that individual opposer pleads, for example, that he or she is offended by the individual or corporate trademark appli-

cant's products or its hiring policies, political affiliation, environmental record, advertising campaigns, etc. We do not believe that Section 13 of the Lanham Act (which section sets out who may file an opposition) was intended to have such a result.

The Board's analysis was both wise and correct, and its decision warrants affirmance, not reversal. *Cf. Conte Bros. Automotive, Inc. v. Quaker State–Slick 50, Inc.,* 165 F.3d 221, 236, 49 USPQ2d 1321, 1333 (3d Cir.1998) ("Expanding standing to parties such as Appellants would result in a great increase in marginal litigation in the federal courts and would not serve the underlying purposes of the Lanham Act—to ferret out unfair competitive methods and protect businesses from the unjust erosion of their good will and reputation.")

Until today, neither the trademark office nor the courts has entertained an opposition or cancellation proceeding where the only purported interest in the outcome is that of the general public. Even the two Board cases upon which the panel majority places its heaviest reliance do not go that far. In *Bromberg* the opposers pled that the slogan was disparaging to them as women, and in *Harjo* the cancellation plaintiffs pled that the mark "Redskins" was disparaging to them as Native Americans. In contrast, the marks here opposed do not disparage Mr. Ritchie. Mr. Ritchie, acting to "vindicate [his] own value preferences," *Sierra Club,* has not distinguished himself from the population at large. "Standing is not 'an ingenious academic exercise in the conceivable.'" *Lujan v. Defenders of Wildlife,* 504 U.S. 555, 566, 112 S.Ct. 2130, 119 L.Ed.2d 351 (1992) (rejecting as "beyond all reason" the argument that people who see elephants in the Bronx Zoo have standing to challenge a development project in Sri Lanka funded by a federal agency).

It is simply incorrect to open the trademark tribunals to the litigation of moral preferences by persons with no real interest in the trademark. *See* Daphne Robert Leeds, The New Trade-Mark Manual 85 (1947) ("An opposition is not directed towards the public interest, but has as its purpose the protection of the opposer's rights.") Al-

though the majority argues that the issue is not "the morals of the applicant," but the "public perception" of immorality if these marks are used on goods, such perception is not the personal interest that grants legal standing to oppose registration. *See Phillips Petroleum Co. v. Shutts,* 472 U.S. 797, 804, 105 S.Ct. 2965, 86 L.Ed.2d 628 (1985) (tribunals should "avoid deciding questions of broad social import where no individual rights would be vindicated"). The requirement of a "direct stake in the outcome" is particularly apt when the property at issue involves purely commercial rights. The forum for exercise of the moral preferences of the general public is the cash register for the trademarked goods—not the trademark register.

## C

I do not fully explore, on the incomplete record and argument presented, the constitutional issues implicit in the majority's interpretation of the trademark statute. I mention them to illustrate the complexity of the issues implicit in this interpretation, for the "immoral" and "scandalous" terms of § 2(a) of the Lanham Act have stirred much commentary as a matter of the First Amendment and commercial speech. The panel majority protests that the question before us is not whether these marks constitute immoral or scandalous matter, but the narrower question of whether Mr. Ritchie has standing. I agree. But at the threshold of judicial and administrative process the standing aspect raises cogent questions when, as here, an uninvolved, undamaged person becomes authorized to challenge the right to federal trademark benefits based on his disapproval of the morals of the trademark applicant.

The Court of Customs and Patent Appeals was presented with a constitutional challenge to § 2(a) in *In re McGinley,* 660 F.2d 481, 211 USPQ 668 (C.C.P.A.1982), *aff'g* 206 USPQ 753, 1979 WL 24807 (TTAB 1979).

The Board had refused registration of a mark of explicit nudity. There was no issue of standing or the filing of an opposition, but simply the Board's action in rejecting the application. The court avoided the constitutional issue by observing that the refusal to register a mark did not affect the common law right to use it, concluding that because no conduct was proscribed, First Amendment rights were not abridged.[1] The affirmance of the Board's refusal of registration has been criticized on constitutional grounds, as scholars have pointed out that denial of benefits may be viewed as an abridgement of speech protected by the First Amendment. *See, e.g.,* Melville B. Nimmer, Nimmer on Freedom of Speech 4–33 (1984) (" 'Abridging' within the meaning of the First Amendment may occur even if the law in question does not by its terms either prohibit or punish speech"). Indeed, an abridgement may result from a law that merely burdens an exercise of speech. *See, e.g., American Communications Ass'n v. Douds,* 339 U.S. 382, 402, 70 S.Ct. 674, 94 L.Ed. 925 (1950) ("Under some conditions, indirect 'discouragements' undoubtedly have the same coercive effect upon the exercise of First Amendment rights as imprisonment, fines, injunctions, or taxes"). The Court stated in *Perry v. Sindermann,* 408 U.S. 593, 597, 92 S.Ct. 2694, 33 L.Ed.2d 570 (1972) that "even though a person has no 'right' to a valuable governmental benefit and even though the government may deny him the benefit for any number of reasons, . . . [the government] may not deny a benefit to a person on a basis that infringes his constitutionally protected interests—especially, his interest in freedom of speech."

Trademarks are a form of commercial speech. *Friedman v. Rogers,* 440 U.S. 1, 10 n. 9, 99 S.Ct. 887, 59 L.Ed.2d 100 (1979). In *Central Hudson v. New York Pub. Serv. Comm'n,* 447 U.S. 557, 563, 100 S.Ct. 2343, 65 L.Ed.2d 341 (1980) the Court discussed

---

1. The panel majority also takes this position. I remark only that this ruling has received much criticism. *See, e.g.,* Jendi Reiter, *Redskins and Scarlet Letters: Why "Immoral" and "Scandalous" Trademarks Should Be Federally Registrable,* 6 Fed. Cir. Bar. J. 191 (1996); Theodore H. Davis, Jr., *Registration of Scandalous, Immoral, and* *Disparaging Matter Under Section 2(a) of the Lanham Act: Can One Man's Vulgarity be Another's Registered Trademark,* 83 Trademark Reporter 801 (1993); Stephen Baird, *Moral Intervention in the Trademark Arena: Banning the Registration of Scandalous and Immoral Trademarks,* 83 Trademark Reporter 661 (1993).

the permissible limits of governmental restraint of commercial speech as follows:

> [W]e must determine whether the expression is protected by the First Amendment. For commercial speech to come within that provision, it at least [1] must concern lawful activity and not be misleading. Next, we ask [2] whether the asserted governmental interest is substantial. If both inquiries yield positive answers, we must determine [3] whether the regulation directly advances the governmental interest asserted, and [4] whether it is not more extensive than is necessary to serve that interest.

Regulation of commercial speech may guard against such wrongs as fraud and false advertising, but not as a matter of suppression of social content. *See, e.g., R.A.V. v. City of St. Paul,* 505 U.S. 377, 389, 112 S.Ct. 2538, 120 L.Ed.2d 305 (1992) ("a State may not prohibit only that commercial advertising that depicts men in a demeaning fashion"); *Bolger v. Youngs Drug Prods. Corp.,* 463 U.S. 60, 71–72, 103 S.Ct. 2875, 77 L.Ed.2d 469 (1983) ("[a]t least where obscenity is not involved, the fact that [commercial speech] may be offensive to some does not justify its suppression"); *Carey v. Population Servs. Int'l,* 431 U.S. 678, 701, 97 S.Ct. 2010, 52 L.Ed.2d 675 (1977) ("[that] advertisements of contraceptive products would be offensive and embarrassing to those exposed to them, and that permitting them would legitimize sexual activity of young people [are] classically not justifications validating suppression of expression"); *Virginia State Bd. of Pharmacy v. Virginia Citizens' Consumer Council,* 425 U.S. 748, 765, 96 S.Ct. 1817, 48 L.Ed.2d 346 (1976) ("tasteless and excessive" commercial speech is not stripped of First Amendment protection). The Court stated in *Texas v. Johnson,* 491 U.S. 397, 414, 109 S.Ct. 2533, 105 L.Ed.2d 342 (1989) discussing the political speech of flagburning: "If there is a bedrock principle underlying the First Amendment, it is that the government may not prohibit the expression of an idea simply because society finds the idea itself offensive or disagreeable."

These concerns emphasize the potential for abuse in this court's now removing the requirement that an opposer must have a real interest, a personal interest beyond that of the general public, in order to have standing to oppose a trademark registration. Moral indignation is not such an interest; the trademark tribunals do not serve the busybody and moral cop. The commercial benefits of trademark registration can not be withheld merely because of the registrant's unpopularity or notoriety.

My concern is not with Mr. Ritchie's expression of his conscience, the expression of which I unstintingly defend. However, if there is here pitted a conflict of freedoms, Mr. Ritchie's right to abhor Mr. Simpson's persona does not grant him standing to deprive Mr. Simpson of the right of statutory trademark registration. These are not incompatible rights, and in a society of freedom and law, both are privileged.