THIS OPINION IS A
PRECEDENT OF THE TTAB

Mailed:  September 26, 2008
PTH

**UNITED STATES PATENT AND TRADEMARK OFFICE**

_____

**Trademark Trial and Appeal Board**

_____

Corporacion Habanos, S.A.

v.

Anncas, Inc.

_____

Opposition No. 91165519
to application Serial No. 78363024
filed on February 5, 2004

_____

David B. Goldstein and Michael Krinsky of Rabinowitz,
Boudin, Standard, Krinksy & Lieberman, P.C. for Corporacion
Habanos, S.A.

Jesus Sanchelima, Esq. of Sanchelima & Associates, P.A. for
Anncas, Inc.

_____

Before Hairston, Walsh and Bergsman, Administrative
Trademark Judges.

Opinion by Hairston, Administrative Trademark Judge:

Anncas, Inc. (applicant) filed an application to
register the mark HAVANA CLUB (in standard character form
with a disclaimer of "HAVANA") for goods ultimately
identified as "cigars made from Cuban seed tobacco" in
International Class 34.[1]

---

[1] Serial No. 78363024, filed on February 5, 2004, based on an
allegation of a bona fide intention to use the mark in commerce.

Registration has been opposed by Corporacion Habanos, S.A. (opposer). Opposer alleges that it is in the cigar business and, under Cuban law, is authorized to export Cuban cigars from Cuba; that it exports, advertises and otherwise deals in cigars that are of 100% Cuban origin, both in tobacco and manufacture; that it is the owner of Registration No. 2177837 for the mark HABANOS UNICOS DESDE 1492 and design for cigars and related products in International Class 34; that this mark translates into English as "Unique Havana Cigars Since 1492;" that applicant's mark HAVANA CLUB is primarily geographically deceptively misdescriptive under Section 2(e)(3) of the Trademark Act and deceptive under Section 2(a) of the Act; and that applicant "made a false, material representation to the USPTO when it authorized amendment of its identification of goods from 'cigars' to 'cigars made from Cuban seed tobacco,' in response to the USPTO's September 1, 2004 Office action refusing registration of the mark as primarily geographically deceptively misdescriptive."

Applicant, in its answer, denied the salient allegations of the notice of opposition.[2]

Evidentiary Objections

We turn first to opposer's objections to portions of applicant's evidence. Opposer has objected to the lists of applications and registrations from the USPTO's TESS database, and records of applications and registrations from the lists. This evidence was introduced as exhibits to the testimony depositions of applicant's witnesses and by way of applicant's notice of reliance. Opposer argues that the lists and records of registrations and applications are irrelevant. Trademark Rule 2.122(e) specifically provides that USPTO official records, such as TESS lists of registrations and applications, and the records thereof, may be introduced by notice of reliance. Such evidence may also be introduced during the testimony of a witness. Opposer's objection to this evidence on the ground of relevance goes to the weight of the evidence rather than its admissibility, and we will therefore consider the evidence for whatever probative value it may have.

---

[2] Applicant also asserted abandonment, lack of standing, and lack of a "place/goods" association as affirmative defenses. However, these are not true affirmative defenses. Moreover, applicant subsequently withdrew its assertion of lack of a "place/goods" association. In addition, applicant filed a counterclaim seeking to cancel opposer's pleaded Registration No. 2177837 on the ground of abandonment. The Board, in a decision issued November 29, 2006, granted summary judgment in opposer's favor on the counterclaim.

Opposer has objected to Bock Testimony Exhibit 28, a copy of a third-party advertisement for "Havana Honeys" cigars, introduced during the testimony of applicant's president, William Bock.  Because Mr. Bock was unable to identify the publication in which the advertisement appeared or to state with certainty that he downloaded the advertisement from a website, opposer's objection to the advertisement on the ground that the exhibit was not properly authenticated is sustained.  In view thereof, we have not considered this exhibit in reaching our decision herein.

Opposer has objected to Bock Testimony Exhibit 70, a copy of an article which appeared in Smoke Magazine Online, introduced during the testimony of Mr. Bock.  Applicant offered the article to show that another entity in the United States distributes cigars made from Cuban seed tobacco.  Opposer objects to the article on the ground that it is hearsay to the extent that applicant seeks to rely on any statements made therein for the truth of the matters.

We sustain opposer's objection to this exhibit because it is hearsay.  Statements made by others in a magazine article are not admissible to prove the truth of the matters.  In view thereof, we have not considered this exhibit in reaching our decision herein.

Opposer has objected to the testimony of Mr. Bock concerning what tobacco growers and others told him about Cuban seed tobacco on hearsay grounds. Opposer's objection is sustained as the statements of what tobacco growers and others told Mr. Bock are hearsay. In view thereof, we have not considered this testimony in reaching our decision herein.[3]

Finally, applicant has objected to portions of the testimony of opposer's witness Richard B. Perelman, on the ground that Mr. Perelman is not qualified as an expert in "either consumer perception or growing tobacco or Applicant's registration effect of [sic] his client's marketing plans." (Applicant's Statement Of Evidentiary Objections, Page 5). Mr. Perelman has been the author since 1994 of Perelman's Pocket Cyclopedia of Cigars, an annual publication which catalogs more than 1200 brands of cigars marketed in the United States. In addition, Mr. Perelman has authored three editions of Perelman's Pocket Cyclopedia of Havana Cigars which covers Cuban cigar production and Cuban cigar brands. Since 2004, he has been the editor of the website CigarCyclopedia.com which offers, inter alia,

---

[3] We should add that even if we had considered the exhibits and testimony introduced by applicant to which we have sustained opposer's objections, our decision herein would be the same. This is because the exhibits and testimony do not change our finding, discussed below, regarding whether the consuming public is likely to believe that Havana indicates the origin of the cigars

information about cigars, accessories, cigar brand news and issues. He has made two trips to Cuba under license from the Treasury Department of the United States, including visits to Cuban tobacco plantations and he has contributed numerous articles concerning cigars to publications on cigars.

In view of his background and experience, we find Mr. Perelman to be qualified as an expert on cigars and Cuban cigars and tobacco, in particular. In reading his testimony, however, we have not considered him to be an expert in trademark law, and any opinion relating to the ultimate question of law in this case has been given no weight.

The Record

The record consists of the pleadings and the file of the involved application. Opposer submitted the trial testimony on written questions (with exhibits) of Manuel Garcia Morejon, opposer's Commercial Vice-President, and Eumelio Espino Marrero, Technical and Productive Under Director of the Cuban Institute of Tobacco Research; and the trial testimony (with exhibits) of Richard B. Perelman, President of Perelman Pioneer & Company. In addition, opposer submitted a notice of reliance on the following:

identified in the application, when in fact the cigars will not come from Havana.

(1) portions of the discovery deposition of William Bock, applicant's President, (2) entries from dictionaries, an encyclopedia and gazetteer for "Havana" and "Cuba," (3) excerpts from books and magazines with references to "Havana" and "Havana cigar(s)," (4) printouts of newspaper articles from the Westlaw database with references to "Havana" and "Havana cigar(s)," (5) USPTO Office actions in third-party applications for marks that contain "HAVANA," (6) applicant's responses to opposer's first and second set of interrogatories, (7) contents of the files of TTAB proceedings in which opposer was plaintiff, (8) a status and title copy of opposer's pleaded Registration No. 2177837, (9) a copy of a license from the Department of the Treasury which authorizes opposer to prosecute this proceeding, and (10) copies of magazine advertisements featuring opposer's products.

Applicant has submitted the trial testimony (with exhibits) of William Bock, applicant's President, and Benjamin Gomez Jr., President of Inter America Cigars. In addition, applicant submitted a notice of reliance on third-party registrations for marks that contain "HAVANA," or "HABANA," or variations of these terms.

The case has been fully briefed.

Preliminary Matter

Applicant, for the first time in its brief, argues that Section 211(b) of the Omnibus Consolidated and Emergency Supplemental Appropriations Act of 1999 bars opposer from bringing this opposition. Section 211(b) provides that:

> No U.S. court shall recognize, enforce or otherwise validate any assertion of treaty rights by a designated national or its successor-in-interest under sections 44(b) or (e) of the Trademark Act of 1946 (15 U.S.C. 1126(b) or (e)) for a mark, trade name, or commercial name that is the same as or substantially similar to a mark, trade name, or commercial name that was used in connection with a business or assets that were confiscated unless the original owner of such mark, trade name, or commercial name, or the bona fide successor-in-interest has expressly consented.

Applicant states that:

> Opposer is a Cuban entity and Applicant's purported trademark rights fall under the terms of *Section 211 of the Omnibus Consolidated and Emergency Supplemental Appropriations Act on [sic] 1999. Havana Club Holdings, S.A. v. Galleon, S.A., 203 F.3d 116, 53 USPQ2d 1609, 1618 (2d Cir. 2000)* (italics in original) The designation HAVANA CLUB was hotly litigated by the Republic of Cuba, through another state instrumentality. *Id.* The common owner of the mark is the Republic of Cuba. The real motivation in opposing Applicant's mark registration [sic], among dozens of other marks registered and/or pending is the ulterior motivation to protect a confiscated mark.

(Brief at 21)

Applicant's argument is meritless because applicant has failed to point to any part of Section 211(b) that bars this proceeding, and we find none. Also, although applicant cites to Havana Club Holding, S.A. v. Galleon, S.A., <u>supra</u>, as support for its position that Section 211(b) bars opposer

8

from bringing this opposition, that case does not support applicant's position. Indeed, in that case, which involved a false designation of geographic origin claim, the Court explicitly held that Section 211(b) does not apply to such a claim, because it is not based on any ownership claim to a confiscated mark. Here, opposer's Sections 2(e)(3) and 2(a) claims are not based on any ownership claim to a confiscated mark, and Section 211(b) has no applicability.

Standing

We turn then to the issue of standing. Applicant maintains that opposer lacks standing to bring this proceeding and points to opposer's failure to satisfy the standing requirements set forth in Lujan v. Defenders of Wildlife, 504 U.S. 555, 560, 119 L.Ed.2d 351, 112 S. Ct. 2130 (1992). However, applicant's reliance on Lujan is misplaced inasmuch as the standing test set forth therein is for federal court Article III standing, not standing for an opposition proceeding.

To establish standing in an opposition, an opposer must show that it has a "real interest" in the outcome of the proceeding; that is, that it has a direct and personal stake in the outcome of the opposition. See Ritchie v. Simpson, 170 F.3d 1092, 50 USPQ2d 1023 (Fed. Cir. 1999); Jewelers Vigilance Committee, Inc. v. Ullenberg Corp., 823 F.2d 490, 2 USPQ2d 2021 (Fed. Cir. 1987).

Opposer has submitted a status and title copy of its pleaded Registration No. 2177837 issued August 4, 1998 (Renewed) for the mark HABANOS UNICOS DESDE 1492 and design (with all the literal elements disclaimed), shown below, for cigars and related products. Opposer's notice of reliance, ex. 17.



In addition, opposer's Commercial Vice-President, Mr. Morejon testified that opposer currently uses its registered mark in advertising in United States publications and intends to sell 100% Cuban-origin cigars in the United States as soon as United States laws allow. Morejon dep. at 41-52.

Further, opposer, a Cuban entity subject to the United States embargo on Cuban goods, has also submitted a letter from the Department of Treasury confirming that Cuban entities are permitted under Section 515.527 of the Cuban Assets Control Regulations, 31 C.F.R. Part 515, to "file an opposition to the registration of a new trademark … where

these actions relate to protection of a trademark in which Cuba … has an interest." Opposer's notice of reliance ex. 18.

In view of the foregoing, we find that opposer has a "real interest" in the outcome of this proceeding; that opposer, as a Cuban entity, is not restricted from pursuing this opposition; and that opposer has established its standing.[4] So as to be perfectly clear, opposer has standing, although it does not and cannot engage in any business in the United States due to the embargo on Cuban goods.

The Section 2(a) Claim

We need not consider opposer's Section 2(a) claim in view of the Federal Circuit's pronouncement that it "anticipates that the PTO will usually address geographically deceptive marks under subsection 2(e)(3) of the amended Lanham Act rather than subsection 2(a)." In re California Innovations Inc., 329 F.3d 1334, 66 USPQ2d 1853, 1856-57 (Fed. Cir. 2003). See also Corporacion Habanos S.A. v. Guantanamera Cigars Co., 86 USPQ2d 1473, 1475 (TTAB 2008) ["… we will give no further consideration to [opposer's]

---

[4] We note that applicant also argues, for the first time in its brief, that opposer is not the real party in interest to bring this opposition because another entity has superior rights in the term HABANA. Apart from the fact that it is clearly untimely for applicant to raise this issue for the first time in its brief, opposer has not claimed rights in the term HABANA per se, and has

Section 2(a) claim, but consider the Section 2(e)(3) ground"].

The Section 2(e)(3) Claim

The elements of a Section 2(e)(3) claim are as follows: (1) the primary significance of the mark is a generally known geographic location; (2) the consuming public is likely to believe the place identified by the mark indicates the origin of the goods bearing the mark (i.e., that a goods/place association exists), when in fact the goods do not come from that place; and (3) the misrepresentation would be a material factor in the consumer's decision to purchase the goods. California Innovations, supra, 329 F.3d at 1341, 66 USPQ2d at 1858.

*(1)  The primary significance of the mark is a generally known location.*

Applicant does not dispute that the primary significance of the mark HAVANA CLUB is a generally known location.  Moreover, we note that opposer has shown from entries in The Columbia Gazetteer of North America (2000), The Britannica Encyclopedia Online, and ten English language dictionaries that "Havana" is the name of the largest city and chief port in the West Indies, and the political, economic, and cultural center of Cuba.  We find therefore that opposer has established that Havana is a geographic

_____

disclaimed any rights to the wording in its mark which includes

location in Cuba and that Havana, Cuba is known to the relevant public. In addition, we find that the primary significance of the mark HAVANA CLUB is geographic. The word CLUB does not detract from the primary geographic significance of the mark. See, e.g., In re Wada, 194 F.3d 1297, 52 USPQ2d 1539 (Fed. Cir. 1999) [The mark NEW YORK WAYS GALLERY projects a primarily geographic significance and the addition of WAYS GALLERY to NEW YORK does not detract from the primary significance of the mark]; In re Boyd Gaming Corp., 57 USPQ2d 1944 (TTAB 2000) [The primary significance of the marks ROYAL HAVANA RESORT & CASINO and HAVANA RESORT AND CASINO is geographic, and the additional wording in the marks does not detract from the geographic meaning].

*(2)  The consuming public is likely to believe the place identified by the mark indicates the origin of the goods bearing the mark when in fact the goods do not come from that place.*

This element involves two issues. The first issue is whether there is a goods/place association; the second issue is whether or not applicant's goods in fact come from the place named. With respect to the first issue, applicant does not dispute a goods/place association. As previously noted, applicant initially asserted in an affirmative

---

the plural term, i.e., HABANOS.

defense that there is no "place/goods" association. However, applicant subsequently withdrew this affirmative defense and does not now argue in its brief that there is no goods/place association. In any event, opposer's evidence establishes a goods/place association. Opposer submitted, inter alia, an entry for the word "Havana" taken from the Columbia Gazetteer (2000) which states that "local industries include … factories making the famous Havana cigars." Opposer's notice of reliance no. 2. In addition, the Encyclopedia Britannica Online entry on "Havana" identifies "tobacco production, particularly the world-famous Havana cigars" as one of Havana's important industries. Opposer's notice of reliance no. 3. Further, several English language dictionary entries define "Havana" as both the capital of Cuba and as a cigar made in Cuba or made from Cuban tobacco. Opposer's notice of reliance no. 4. Also, in several news and feature stories and excerpts from cigar publications, "Havana" is used to denote a cigar made in Cuba. Opposer's notices of reliance nos. 5-10.

We turn then to the second issue in this element, that is, whether or not applicant's goods will originate or come from the place named in the mark. Of course, in view of the United States embargo on Cuban goods, applicant is barred from selling cigars made or manufactured in Cuba. See 31 C.F.R § 515.204. However, a product may be found to

originate from a place, even though the product is manufactured elsewhere.  See In re Nantucket Allserve Inc., 28 USPQ2d 1144 (TTAB 1993) [NANTUCKET NECTARS held primarily geographically descriptive of soft drinks, even though the goods were manufactured elsewhere, where the record showed that applicant's headquarters and research and development division were on Nantucket; the distributor of the goods was located on Nantucket; the goods were sold in the applicant's store on Nantucket; and the specimens were labels that bore a picture of Nantucket, stated that the goods were "born" or "created" on Nantucket, and mentioned no other geographic location].

In addition, a product might be found to originate from a place where the main component or ingredient was made in that place.  See In re Joint-Stock Company "Baik," 80 USPQ2d 1305 (TTAB 2006) [BAIKALSKAYA – the Russian equivalent of "from Baikal" or "Baikal's" – held primarily geographically descriptive of vodka, where the record showed that applicant was located in Irkutsk, Russia, a city near Lake Baikal, and that applicant's vodka is made from the water of Lake Baikal].

On the other hand, a product may be found not to originate from a section or area of a metropolitan area if the record shows only that the applicant is located somewhere in the metropolitan area.  In re South Park Cigar

15

Inc., 82 USPQ2d 1507 (TTAB 2007) [YBOR GOLD held primarily merely geographically misdescriptive of cigars and tobacco where the record showed that applicant was located somewhere in Tampa, Florida but not the Ybor City section of Tampa].

Thus, the central issue in this case is whether applicant's "cigars made from Cuban seed tobacco" should be deemed to originate from Havana, Cuba, although they will be made elsewhere. Opposer maintains that such goods should not be deemed to originate or come from Havana, Cuba. In particular, opposer argues that "'Cuban seed tobacco' is a term used in the United States to refer to tobacco grown outside Cuba and claimed to be grown from seeds that are multi-generation descendants of seeds taken from Cuba at least 45 years ago," "that there is no connection between 'Cuban seed tobacco' and Havana, or Cuba or Cuban tobacco or cigars other than the claim of distant descent," (Brief at 3) and this "claim of distant descent" is insufficient to warrant a finding that cigars made from "Cuban seed tobacco" come from or originate in Havana, Cuba.

Opposer offered the testimony of Eumelio Espino Marrero, Technical and Productive Under Director of the Cuban Institute of Tobacco Research. Mr. Espino testified that tobacco grown outside Cuba over many generations will not and cannot replicate the qualities or characteristics of tobacco grown in Cuba. According to Mr. Espino, the

16

characteristics of a cigar are based on four factors, namely, the kind (genetic type and purity) of the tobacco; the soil; the climate; and the agricultural and manufacturing processes. Mr. Espino testified that if any "one of these factors is missing, then you don't get the quality that distinguishes the Habano in the world." Espino dep. at 34. According to Mr. Espino, "in another environment in another location, the [tobacco] plant is not going to express with loyalty the characteristics that it does express in the area or in the zone that we cultivated in Cuba." Espino dep. at 38. Mr. Espino observed that tobacco grown in Nicaragua, for example, in the 1980's from seeds taken from Cuba in the 1960's "no longer was the original Cuban tobacco." Espino dep. at 39.

Opposer also offered the testimony of Richard B. Perelman, president of Pioneer & Company and editor of Perelman's Pocket Cyclopedia of Cigars. With regard to the meaning of "Cuban seed tobacco" in the United States, Mr. Perelman testified that:

> It is generally understood to the point of not ever being questioned that when there is a reference to Piloto Cubano or to Cuban seed, we're talking about some distant relationship with Cuba at a time prior to the United States trade embargo [in] 1962. And so we're talking about some relationship to tobacco seeds that could have come from Cuba in the 1940's or 1950's or maybe 1960 or '61. But not any time after that.

Perelman dep. at 36.

Further, Mr. Perelman testified that claims of "Cuban seed tobacco" are a marketing tool in the United States that may "imply some sort of relationship or nexus to Cuba or the Cuban cigar industry, but there really is none." Perelman dep. at 56. In addition, Mr. Perelman testified that:

> In my opinion and to my knowledge, there is no relationship between Cuban seed tobaccos and the city of Havana, Cuba, the Cuban cigar industry or Cuban tobacco except [a] potential and unprovable relationship that goes back many, many, many generations and dozens of years. As a matter of fact, it would be more than 40 years.

Perelman dep. at 56.

Applicant has offered no testimony or other evidence that rebuts the testimony of opposer's witnesses. Rather, applicant simply maintains that the term "Cuban seed tobacco" is widely used in the industry, and that the USPTO considers "cigars made from Cuban seed tobacco" an acceptable identification of goods. Applicant has submitted copies of a number of third-party registrations and applications for marks covering goods identified as "cigars made from Cuban seed tobacco."

In this case, the uncontroverted testimony of opposer's witnesses establishes that "Cuban seed tobacco" is descended from tobacco seeds taken decades ago from Cuba. Indeed, in response to opposer's Interrogatory no. 16(f), applicant acknowledges that "Cuban seed tobacco" "descended from seeds

18

that were taken from Cuba in the late 1950's and early 1960's."

And, in the case of applicant's intended goods, even the claim that its cigars will be made from "Cuban seed tobacco" appears unverifiable as applicant's president, Mr. Bock, testified that he has no knowledge whether the intended tobacco in fact comes from seeds that are distant descendants of seeds that came from Cuba, or seeds that in fact have no Cuban ancestry. Bock dep. at 101-102.

Further, the uncontroverted testimony of opposer's witnesses establishes that there is little or no connection between the characteristics of "cigars made from Cuban seed tobacco" and 100% or genuine Cuban cigars, that is, those which are made from tobacco seed grown or cultivated in Cuba. Indeed, even Mr. Bock admitted that he has no information that cigars made from "Cuban seed tobacco" share any qualities and characteristics, such as taste, flavor or aroma, with cigars made in Cuba. Bock disc. dep. at 96.

We find that there is an insufficient connection between Cuban seed tobacco, which is descended from tobacco seeds taken from Cuba many decades ago, and Havana to support a finding that cigars made from Cuban seed tobacco come from or originate in Havana. This is particularly the case because the record in this case shows that cigars from

19

Cuban seed tobacco share few, if any, qualities or characteristics of genuine or 100% Cuban cigars.

In this case, the connection between applicant's intended goods and Havana is far too tenuous and is unlike the factual situations in Nantucket and In re Joint-Stock Company "Baik".

Applicant also argues that its goods may eventually originate in Cuba. Specifically, applicant states that "[c]onceivably, Applicant may even purchase goods [from Cuba] if the Cuban embargo is lifted." (Brief at 24) Suffice it to say that this statement is far too speculative to support a finding that applicant's goods will originate in or come from Havana.

In view of the foregoing, the second element of the Section 2(e)(3) test has been satisfied, that is, the consuming public is likely to believe that Havana, Cuba indicates the origin of applicant's goods when in fact the goods will not come from that geographic location.

Before turning to the third and final element, two matters require comment. Applicant argues that "cigars made from Cuban seed tobacco" is an acceptable identification of goods. The issue of whether "cigars made from Cuban seed tobacco" is an acceptable identification of goods is not before us and is not relevant to whether applicant's mark is primarily geographically deceptively misdescriptive under

20

Section 2(e)(3). Indeed, such issue is an examination issue and our decision herein should not be construed as a holding one way or the other on this issue.

Second, to the extent that applicant argues that it has been the USPTO's practice to allow an applicant to overcome a Section 2(e)(3) refusal by amending its identification of goods from "cigars" to "cigars made from Cuban seed tobacco," and disclaiming the geographic term in the mark, such argument is not well taken. It cannot be said from the third-party registrations and applications submitted by applicant that this has been the policy of the USPTO. It may well be the practice of just a few examining attorneys. In any event, it is well established that even if some prior registrations have some characteristics similar to applicant's, the USPTO's allowance of such prior registrations does not bind the Board. In re Nett Designs Inc., 236 F.3d 1339, 57 USPQ2d 1564, 1566 (Fed. Cir. 2001).

(3) *The mark's misrepresentation is a material factor in the consumer's decision to purchase the goods.*

We turn then to the third and final element, which requires proof that the misleading goods/place association is a material factor in the customer's decision to purchase applicant's goods. Opposer has established that cigars are a principal product of Havana, and the desirability of cigars from Havana is well-known the world over. In view

21

thereof, we find that the goods/place association created by applicant's mark with Havana undoubtedly would be material in a customer's decision to purchase applicant's cigars.

Conclusion

Based on the evidence of record and for the reasons discussed above, we find that opposer has satisfied all three of the elements of its Section 2(e)(3) claim. The primary significance of applicant's mark is that of a geographically known place; there is a goods/place association, and applicant's goods will not come from the place named; and such goods/place association created by applicant's mark with Havana would be material to the decision to purchase applicant's goods.

Fraud

In view of our decision in opposer's favor on its Section 2(e)(3) claim, we need not and do not reach opposer's pleaded claim of fraud with respect to applicant's amendment of its identification of goods.

**Decision**: The opposition based on Section 2(e)(3) of the Trademark Act is sustained and registration to applicant is refused.