THIS OPINION IS A
PRECEDENT OF THE
TTAB

Mailed: February 10, 2020

UNITED STATES PATENT AND TRADEMARK OFFICE

————

Trademark Trial and Appeal Board

————

*AT&T Mobility LLC*

*v.*

*Mark Thomann and Dormitus Brands LLC*[1]

————

Opposition No. 91218108

————

Jeffrey M. Becker of Haynes and Boone, LLP,
  for AT&T Mobility LLC.

Joseph C. Gioconda of Gioconda Law Group PLLC,
  for Dormitus Brands LLC.

————

Before Zervas, Wolfson, and Lynch,
   Administrative Trademark Judges.

Opinion by Wolfson, Administrative Trademark Judge:

As explained below, this proceeding was bifurcated into two phases, and this opinion concerns only the issue of Opposer's standing. Dormitus Brands LLC ("Applicant"), by assignment from Thomann, seeks registration on the Principal

---

[1] After proceedings commenced, Mark Thomann assigned his trademark applications that are the subject of this opposition to Dormitus Brands, LLC. On October 30, 2014, by Board order, Dormitus Brands LLC was "joined as a party defendant and applicant." 9 TTABVUE.

Opposition No. 91218108

Register of the standard character mark CINGULAR for the following goods

identified in International Class 9: [2]

> Carrying cases, holders, protective cases and stands featuring power supply connectors, adaptors, speakers and battery charging devices, specially adapted for use with handheld digital electronic devices, namely, cell phones; Cases for mobile phones; Cell phone battery chargers; Cell phones; Cellular phone usage detection system comprising a camera and a mobile phone signal receiving device; Cellular phones; Cellular telephones; Chipsets for connecting multimedia home devices, home and VoIP phones and digital cordless phone devices; Computer software for controlling self-service terminals; Computer software to enable the transmission of photographs to mobile telephones; Computer software, namely, an application allowing sales and field service employees to update and receive data stored in an enterprise's computer databases in real time, using a mobile device, with full telephony integration with the telephone and/or software features of the mobile device; Computer software, namely, software development tools for the creation of mobile internet applications and client interfaces; Digital cellular phones; Digital telephone platforms and software; Fixed location telephones; Hands free devices for mobile-phones; Headsets for mobile telephones; Headsets for telephones; In-car telephone handset cradles; Internet phones; Mobile phones; Mobile telephones; Pre-paid telephone calling cards, magnetically encoded; Satellite telephones; Telecommunications and data networking hardware, namely, devices for transporting and aggregating voice, data, and video communications across multiple network infrastructures and communications protocols; Telecommunications equipment, namely, fiber-optic transceivers, fiber optic repeaters, converters and optimizers, wave division multiplexers, free-space optics transmission systems, switches including Ethernet switches and routers, fiber-to-the-home and Ethernet-over-VDSL access aggregators, terminators and repeaters, and remote presence management products, namely, switches, and console, alarm, sensor and power management devices; Telecommunications transmitters; Telephone call router, for home and office touchtone phones, for international and long distance calls made from various telephony platforms including VoIP platform without the requirement for internet; Telephone call screening and blocking device consisting of a

---

[2] Serial No. 86179822 was filed Jan. 30, 2014 on the basis of Applicant's allegation of a bona fide intent to use the mark in commerce under Section 1(b) of the Trademark Act, 15 U.S.C. § 1051(b).

microprocessor that uses the telephone cord between the telephone and wall jack for the purpose of blocking unwanted calls; Telephone connectors; Telephone equipment, namely, caller identification boxes; Telephone sets with screen and keyboard; Telephone terminal; Telephone transmitters; Video phones; Video telephones; Wireless telephones; Wireless television set for providing video conferencing and telephone service over the internet

and the composite mark depicted below ("WIRELESS" disclaimed):[3]



for

Carrying cases for cell phones; Cell phone battery chargers; Cell phone battery chargers for use in vehicles; Cell phone cases; Cell phone covers; Cell phone faceplates; Cell phones; Cellular phone usage detection system comprising a camera and a mobile phone signal receiving device; Cellular phones; Devices for wireless radio transmission; Digital audio and video recorders and players; Digital entertainment systems for watching, storing and sharing digital content on a home computer network; Digital phones; Digital telephone platforms and software; Downloadable audio files, multimedia files, text files, e-mails, written documents, audio material, video material and games featuring information in the form of downloadable short educational/training communications in the field of human resource development for the promotion of employee retention, career growth and increased productivity for employees and employers; Downloadable ring tones and graphics for mobile phones; Downloadable ring tones for mobile phones; Downloadable ring tones, graphics and music via a global computer network and wireless devices; Hands free devices for mobile-phones; Hands free kits for phones; Head-clip cell phone holders; Headsets for cellular or mobile phones; Headsets for mobile telephones; Mobile computers; Mobile phones; Mobile telephone accessories, namely, belt clips; Mobile telephone apparatus with built-in facsimile systems; Mobile telephone batteries; Mobile telephones; Sound and video recording

---

[3] Serial No. 86223138 was filed March 17, 2014, on the basis of Applicant's allegation of a bona fide intent to use the mark in commerce under Trademark Act Section 1(b). The description of the mark reads: "The mark consists of an orange fanciful man depicted with an 'X-shaped' stick figure design with the wording 'CINGULAR WIRELESS' appearing in black adjacent to it." The colors black and orange are claimed as a feature of the mark.

and playback machines; Telecommunications and data networking hardware, namely, devices for transporting and aggregating voice, data, and video communications across multiple network infrastructures and communications protocols; Telecommunications equipment, namely, fiber-optic transceivers, fiber optic repeaters, converters and optimizers, wave division multiplexers, free-space optics transmission systems, switches including Ethernet switches and routers, fiber-to-the-home and ethernet-over-VDSL access aggregators, terminators and repeaters, and remote presence management products, namely, switches, and console, alarm, sensor and power management devices; Telecommunications hardware and software for monitoring and alerting remote sensor status via the Internet; Telephone and radio lightwave data links; Telephone apparatus and receivers; Telephone call router, for home and office touchtone phones, for international and long distance calls made from various telephony platforms including VoIP platform without the requirement for internet; Telephone call routers for long distance calls made through PSTN and VoIP platforms from any touchtone phone without a requirement for internet access; Video phones; Wireless adapters for computers; Wireless broadband radios; Wireless cellular phone headsets; Wireless communication device featuring voice, data and image transmission including voice, text and picture messaging, a video and still image camera, also functional to purchase music, games, video and software applications over the air for downloading to the device; Wireless communication devices for transmitting images taken by a camera; Wireless communication devices for voice, data or image transmission; Wireless computer peripherals; Wireless POS (point of service) devices; Wireless telephones; Wireless telephony apparatus; Wireless transceivers with collection and display technology for the status and tracking of retail goods from the backdoor to the shelf

in International Class 9.

AT&T Mobility, LLC ("Opposer") opposed registration of Applicant's marks on the following grounds: (1) false suggestion of a connection under Section 2(a) of the Trademark Act, 15 U.S.C. § 1052(a); (2) misrepresentation of source under Section 14(3), 15 U.S.C. § 1064(3);[4] (3) lack of a bona fide intention to use the marks as of the

---

[4] Section 14(3) of the Trademark Act sets forth grounds for cancellation of registrations that can be brought at any time.

filing date of the involved applications; and (4) that the applications are void ab initio due to an invalid assignment under Section 10(a)(1), 15 U.S.C. § 1061(a)(1). Applicant denied all salient allegations in the Notice of Opposition and asserted the affirmative defenses of abandonment, estoppel, and unclean hands.

At the Board's suggestion, following multiple attempts by the parties to obtain summary judgment,[5] the Board granted the parties' Stipulation to bifurcate the proceeding into two phases.[6] *See* Fed. R. Civ. P. 42(b) (allowing court to order a separate trial of one or more separate issues); Trademark Rule 2.116(a), 37 C.F.R. § 2.116(a) ("Except as otherwise provided, and wherever applicable and appropriate, procedure and practice in inter partes proceedings shall be governed by the Federal Rules of Civil Procedure."). The Stipulation allowed for an initial phase directed to the question of standing, with a period for discovery on the issue followed by trial and briefing; and should the Board resolve the issue of standing in Opposer's favor, the

---

[5] On June 5, 2015, Opposer moved for partial summary judgment on its claim under Section 10(a)(1). 16 TTABVUE. Applicant cross-moved for summary judgment on its asserted defense of abandonment. 18 TTABVUE. The Board denied the parties' cross-motions, finding as a threshold matter that Opposer failed to submit evidence with its partial motion for summary judgment to establish its standing to bring this proceeding and declining to consider the parties' cross-motions on substantive grounds. 27 TTABVUE. On June 21, 2017, Applicant then moved for summary judgment on all pleaded claims. 38 TTABVUE. Opposer was granted limited discovery under Federal Rule 56(d), 52 TTABVUE, following which Opposer responded to Applicant's motion and cross-moved for summary judgment in its favor. 53 TTABVUE. The Board, in an order dated March 8, 2017, found genuine disputed issues of material fact regarding Opposer's standing and denied the cross-motions, advising the parties that no further motions for summary judgment would be considered. 58 TTABVUE.

Citations to the record are to "TTABVUE," the Board's online docketing system. The number preceding TTABVUE corresponds to the docket entry number, and any number(s) following TTABVUE refer to the page number(s) of the docket entry where the cited materials appear.

[6] Stipulation at 59 TTABVUE, Stipulation granted at 60 TTABVUE.

Board would then allow "for at least ninety days of discovery for the remaining issues in this proceeding as well as set a trial period for those remaining issues."[7]

In accordance with the Stipulation, the parties took discovery on the question of standing, submitted evidence, and briefed the issue of Opposer's standing, which is now ready for decision.

## I.   OBJECTIONS TO THE RECORD

Each party made evidentiary objections to the adverse party's testimony and documentary evidence.[8] None of the testimony and/or exhibits sought to be excluded is outcome-determinative for purposes of standing. Given this fact, coupled with the number of objections, we see no compelling reason to discuss the objections in a detailed fashion at this stage. As a general matter, "the Board is capable of weighing the relevance and strength or weakness of the objected-to testimony and evidence, including any inherent limitations," and keeping in mind "the various objections raised by the parties" in determining the probative value of objected-to testimony and evidence. *Kohler Co. v. Honda Giken Kogyo K.K.*, 125 USPQ2d 1468, 1478 (TTAB 2017) (citing *Luxco, Inc. v. Consejo Regulador del Tequila, A.C.*, 121 USPQ2d 1477, 1479 (TTAB 2017)).

Suffice it to say, we have considered all of the testimony and exhibits submitted by the parties. In doing so, we have kept in mind the various objections raised by the parties, and we have accorded whatever probative value the subject testimony and exhibits merit. To the extent the parties intend to make or renew any objection during

---

[7] 60 TTABVUE 2.

[8] 152 TTABVUE 49 (Opposer); 154 TTABVUE 57 (Applicant).

the trial stage of this proceeding pertinent to the substantive issues, our decision to decline consideration at this stage is without prejudice.

## II.  THE RECORD

The record includes the pleadings, and, by operation of Trademark Rule 2.122(b), 37 C.F.R. § 2.122(b), the files of the subject applications. The record also includes:

### A. Opposer's Evidence

Opposer introduced the following documentary evidence and testimony declarations:

1. Testimony Declaration and accompanying exhibits of George T. Graves, counsel for Opposer (79-83, 100 TTABVUE);

2. Testimony Declaration and accompanying exhibits of Cynthia C. Rozier, Assistant Vice President of Marketing Management for AT&T Mobility Services, LLC. (84 TTABVUE);[9]

3. Testimony Declaration and accompanying exhibits of Charles M. Nalbone, Assistant Vice President – Senior Legal Counsel for AT&T Services, Inc. (91 TTABVUE);[10]

4. Testimony Declaration and accompanying exhibits of David H. Solomon, Esq., partner at Wilkinson Barker Knauer, LLP (94 TTABVUE);

5. Testimony Declaration of Stephanie Andrews; Lead Manager, Marketing Communications for AT&T Mobility Services, LLC (95 TTABVUE);

6. Testimony Declaration and accompanying exhibits of David Toti, Vice President of Financial Operations for AT&T Services, Inc. (96 TTABVUE);[11]

---

[9] The portions of the Rozier testimony designated confidential are posted at 85-86 TTABVUE. Confidential filings are accessible only by the Board.

[10] The portions of the Nalbone testimony designated confidential are posted at 92-93 TTABVUE.

[11] The portions of the Toti testimony designated confidential are posted at 97-98 TTABVUE.

7. Stipulation (87 TTABVUE) authenticating Opposer's Exhibits 76-113 and 133-143 (88-90 TTABVUE) as business records;[12]

8. Opposer's First Notice of Reliance on Trademark Status & Document Retrieval (TSDR) records for the application files of:

   a. Trademark application Serial. No. 86903169 for the mark AT&T CINGULAR FLIP (73 TTABVUE 5-41, Exhibit 1);
   b. Trademark application Serial. No. 86877203 for the mark AT&T CINGULAR (73 TTABVUE 42-61, Exhibit 2);
   c. Trademark application Serial. No. 86481025 for the mark CINGULAR (73 TTABVUE 62-107, Exhibit 3);
   d. Trademark application Serial No. 86481044 for the mark CINGULAR (73 TTABVUE, Exhibit 4);

9. Opposer's Second, Third and Fourth Notices of Reliance on Internet printouts (75-78 TTABVUE);

10. Opposer's Fifth Notice of Reliance on excerpts from the October 18, 2016 discovery deposition of Professor Jacob Jacoby Ph.D., Professor of Psychology at New York University's Leonard N. Stern School of Business (127 TTABVUE);[13] and

11. Opposer's Sixth Notice of Reliance on excerpts from the October 6-7, 2016 discovery deposition of Mark Thomann, Managing Member of Dormitus Brands LLC (128 TTABVUE).

## B. Applicant's Evidence:

Applicant introduced the following documentary evidence, testimony affidavits and declarations:

1. Affidavit Testimony and accompanying exhibits of Alexandra Noh, Executive Assistant at Gioconda Law Group PLLC (103-107 TTABVUE);

2. Affidavit Testimony and accompanying exhibits of Joseph C. Gioconda, Esq., Applicant's counsel (108-109 TTABVUE);

---

[12] Confidential Exhibits are posted at 89 TTABVUE.

[13] Submitted pursuant to Trademark Rules 2.120(k)(2) and 2.120(k)(3)(i), 37 C.F.R. §§ 2.120(k)(2), (3)(i), and the parties' Stipulation Regarding Expert Testimony of Professor Jacob Jacoby (TTABVUE 126).

3. Discovery Declaration and accompanying exhibits of Prof. Jacoby, (136-137 TTABVUE);[14]

4. Testimony Declaration and accompanying exhibits of Mr. Thomann, (120 TTABVUE);

5. Supplemental Affidavit Testimony of Mr. Gioconda (121 TTABVUE);

6. Excerpts from Mr. Solomon's discovery deposition (149 TTABVUE);[15]

7. Notices of Reliance on:

   a. Printouts of cancelled registrations not subject to this proceeding, containing the term "CINGULAR" (all except one in the name of AT&T Intellectual Property II, L.P.)[16] (102 TTABVUE 6-55);
   b. Discovery deposition and accompanying exhibits of Mr. Nalbone as Opposer's Fed. R. Civ. P. 30(b)(6) witness (138 TTABVUE);[17]
   c. Discovery Deposition and accompanying exhibits of Mr. Toti (142, 145, 147 TTABVUE);[18]
   d. Discovery Deposition and accompanying exhibits of Ms. Rozier (143 TTABVUE);[19]
   e. Excerpts from Prof. Jacoby's Discovery Deposition of October 18, 2016 (127 TTABVUE; Exhibit 178);

---

[14] Portions designated confidential posted at 110 TTABVUE. Admitted into evidence by stipulation of the parties, 126 TTABVUE. Originally submitted at 42 TTABVUE; report at 47 TTABVUE.

[15] The portions of the Solomon testimony designated confidential are located at 150 TTABVUE.

[16] Reg. No. 2596041 was owned by AT&T MOBILITY II, LLC. 102 TTABVUE 49.

[17] The portions of the Nalbone testimony designated confidential are located at 139 TTABVUE. 138 TTABVUE supersedes confidential 111 TTABVUE, Applicant's first filing of the Nalbone discovery deposition, which the Board required (at 133 TTABVUE 10) be resubmitted with only truly confidential material redacted.

[18] The portions of the Toti testimony designated confidential are located at 113-116, 146 TTABVUE. 138 TTABVUE supersedes confidential 113-116 TTABVUE, Applicant's first filing of the Toti discovery deposition, which the Board required be resubmitted with only truly confidential material redacted. 133 TTABVUE 10.

[19] The portions of the Rozier testimony designated confidential are located at 140-141, 144 TTABVUE. Originally submitted at 118 TTABVUE. 143 TTABVUE supersedes confidential 118 TTABVUE, Applicant's first filing of the Rozier testimony deposition, which the Board required be resubmitted with only truly confidential material redacted. 133 TTABVUE 10.

    f.   Additional Excerpts from Prof. Jacoby's Discovery Deposition of October 18, 2016 (135 TTABVUE 5-30);[20]

    g.   Excerpts from Mr. Thomann's Discovery Deposition of October 6-7, 2016 (128 TTABVUE); and

    h.   Screenshots of FCC Form 499 Filer Database Search Results for "AT&T Mobility," and "Cingular" (151 TTABVUE 5-9) and screenshots of FCC Form 499 Filer Database Detailed Information (151 TTABVUE 10-13).

## III.   APPLICABLE LAW

To establish its standing, Opposer must prove that it has a "real interest" in the proceeding beyond that of a mere intermeddler, and a "reasonable basis" for its belief of damage. *Empresa Cubana Del Tabaco v. Gen. Cigar Co.*, 753 F.3d 1270, 111 USPQ2d 1058, 1062 (Fed. Cir. 2014); *Ritchie v. Simpson*, 170 F.3d 1092, 50 USPQ2d 1023, 1025 (Fed. Cir. 1999); *Lipton Indus., Inc. v. Ralston Purina Co.*, 670 F.2d 1024, 213 USPQ 185, 189 (CCPA 1982). A "real interest" is a "direct and personal stake" in the outcome of the proceeding. *Ritchie v. Simpson*, 50 USPQ2d at 1026. A belief in likely damage typically can be shown by establishing a direct commercial interest. *Cunningham v. Laser Golf Corp.*, 222 F.3d 943, 55 USPQ2d 1842, 1844 (Fed. Cir. 2000) (Section 2(d)); *Montecash LLC v. Anzar Enters.*, 95 USPQ2d 1060, 1062 (TTAB 2010) ("Competitors in the same field or industry as the respondent have a personal stake in the resolution of the question.") (Sections 2(e)(1) and 23 genericness).

In the context of a Section 2(a) claim, however, standing "does not rise or fall on the basis of a plaintiff's proprietary rights in a term; rather, a Section 2(a) plaintiff has standing by virtue of who the plaintiff is, that is, the plaintiff's personality or 'persona.'" *Estate of Biro v. Bic Corp.*, 18 USPQ2d 1382, 1385 (TTAB 1991), *cited in*

---

[20] Admitted into evidence by stipulation of the parties, 126 TTABVUE.

*Bos. Ath. Ass'n v. Velocity, LLC*, 117 USPQ2d 1492, 1494 (TTAB 2015) (establishing standing based on use of unregistered mark); *see also Univ. of Notre Dame du Lac v. J.C. Gourmet Food Imps. Co.*, 703 F.2d 1372, 217 USPQ 505, 509 (Fed. Cir. 1983) ("There may be no likelihood of such confusion as to the source of goods even under a theory of 'sponsorship' or 'endorsement,' and, nevertheless, one's right of privacy, or the related right of publicity, may be violated."). Accordingly, for a claim under Section 2(a), Opposer need show only that it has a real interest in the proceeding and a reasonable belief that it will suffer injury flowing directly from the registration of Applicant's marks. *Estate of Biro*, 18 USPQ2d at 1385.

Once an opposer meets the requirements for standing on one claim, it can rely on any available statutory grounds for opposition set forth in the Trademark Act. *See A&H Sportswear Co. v. Yedor*, 2019 USPQ2d 111513, *3 (TTAB 2019) ("Having demonstrated standing on this ground, Opposer may assert any other valid basis for refusal."); *Enbridge, Inc. v. Excelerate Energy LP*, 92 USPQ2d 1537, 1543 n.10 (TTAB 2009) ("If an opposer can show standing as to one ground, it has the right to assert any other ground as well."); *cf. Jeweler's Vigilance Comm., Inc. v. Ullenberg Corp.*, 823 F.2d 490, 2 USPQ2d 2021, 2023 (Fed. Cir. 1987) ("Once standing is established, the opposer is entitled to rely on any of the grounds set forth in section 2 of the Lanham Act which negate applicant's right to its subject registration."); *Corporacion Habanos SA v. Rodriguez*, 99 USPQ2d 1873, 1877 (TTAB 2011) (because petitioners alleged standing as to at least one ground, they may assert any other legally sufficient claims including those under Section 2(a), the Pan American Convention and fraud).

## IV. ANALYSIS

In support of its standing, Opposer pleaded the following:[21]

4. Opposer was initially formed in 2000 under the name Cingular Wireless LLC as a joint venture between SBC Communications and BellSouth and became one of the largest wireless telecommunications companies in the country.

5. In 2001, Opposer began offering wireless telecommunications goods and services under the name "Cingular" and a corresponding logo that includes the words "Cingular Wireless" together with a person looking design element formed by a toy jack with a round ball as a head as shown: [].

6. Opposer's Cingular name and associated Cingular Wireless logo are collectively referred to herein as "Opposer's Identity."

7. Opposer, already the nation's second largest cellular service provider by 2004, grew significantly that year when it purchased the nation's third largest cellular service provide[r], AT&T Wireless. The combined company had a customer base of 46 million people at the time, making it the nation's largest wireless provider.

8. By virtue of its efforts, and the expenditure of billions of dollars on advertising Opposer's Identity, Opposer caused "Cingular" to become a household name, gaining substantial goodwill in connection with both its Cingular name and associated Cingular Wireless logo, which consumers came to recognize as pointing uniquely and unmistakably to Opposer.

11. In 2007, Opposer started a co-branding campaign that displayed both the Cingular and AT&T names and logos to educate the American public that Cingular and AT&T were, due to several mergers, now all part of the same company.

---

[21] Amended Notice of Opposition at 12 TTABVUE 5-6.

12. Also in 2007, Opposer legally changed its name from Cingular Wireless LLC to its current name of AT&T Mobility LLC.

13. Even though Opposer now markets itself under the AT&T name and logo, and has changed its legal name to AT&T Mobility LLC, the fame and reputation of the Cingular name, combined with Opposer's co-branding of the Cingular and AT&T names, has resulted in the consuming public still associating the Cingular name and logo with Opposer.

Opposer argues that it has established its standing based on: (1) its persona as the original Cingular Wireless LLC, whose business continues to this day; (2) its interest in use of the term CINGULAR by its controlled subsidiary, New Cingular Wireless PCS, LLC ("New Cingular"), in its trade name; (3) its reasonable belief that due to residual goodwill in the marks, Applicant's use of the CINGULAR mark would "cannibalize" Opposer's business; and (4) its reasonable belief that if the Federal Communications Commission ("FCC") were to receive complaints from consumers about Applicant's business conducted under the mark CINGULAR, the FCC would mistakenly and harmfully investigate Opposer.[22]

Applicant argues that Opposer abandoned the CINGULAR marks when it stopped using the mark after "making the switch" to AT&T; that Opposer's CINGULAR registrations have expired; that New Cingular does business as AT&T Mobility and does not use its legal name (New Cingular Wireless PCS, LLC) except on formal legal documents; and that "[c]ustomer-facing interactions are under the name AT&T Mobility."[23]

---

[22] 152 TTABVUE 8.

[23] 154 TTABVUE 9.

**A. Opposer's standing claim based on New Cingular's trade name use**

We first consider whether the record reflects New Cingular Wireless PCS, LLC ("New Cingular") uses CINGULAR in its trade name and whether New Cingular's use establishes Opposer's standing. By way of background, in its order denying the parties' first cross-motions for summary judgment,[24] the Board faulted Opposer for relying on the alleged use of the CINGULAR mark by entities that are not named as plaintiffs in this proceeding, including New Cingular.[25] The Board held that Opposer could not rely on their purported use because Opposer had failed to show that it had either a controlling interest in any of the third-party entities, or controlled the manner in which those entities used the CINGULAR name or mark.

In its order denying the parties' second cross-motions for summary judgment, the Board found continuing genuine disputes of material fact regarding Opposer's standing.[26] In particular, the Board found Opposer's evidence regarding its purported relationship with New Cingular insufficient. "The record is unclear about the nature of its corporate relationship to Opposer as either a sister corporation, a partially owned subsidiary, or both."[27] Moreover, Opposer's declarant did not make clear whether New Cingular Wireless does business under the CINGULAR trade name.[28]

---

[24] 27 TTABVUE.

[25] Those non-plaintiff entities are: AT&T Services, Inc., AT&T Intellectual Property II, L.P., New Cingular Wireless Services, Inc., New Cingular Wireless PCS, LLC and AT&T Inc. 27 TTABVUE 5.

[26] 58 TTABVUE.

[27] 58 TTABVUE 7.

[28] *Id.* at 9.

Opposer's burden, then, is to show that New Cingular uses the term and that its corporate relationship with Opposer qualifies Opposer to claim the benefit of New Cingular's use.

1. Does New Cingular use the term CINGULAR?

According to Opposer, New Cingular "uses the 'Cingular' name in its corporate name and in its substantial business operations"[29] as the principal operating entity of AT&T's wireless business.

> In other words, it is the entity that primarily conducts the business of AT&T's mobility division, including holding the businesses' FCC licenses, entering into contracts with wireless customers, and entering in to leases with property owners.[30]

We see no categorical legal bar precluding a corporate or institutional plaintiff from claiming, in a Board proceeding, a false suggestion of a connection with its trade name, where, as here, its allegations of standing are based on alleged injury from an unauthorized use of a mark that falsely suggests a connection with its persona. *See Univ. of Notre Dame du Lac*, 217 USPQ at 508; *Bos. Ath. Ass'n*, 117 USPQ2d at 1496 ("nickname or an informal reference, even one created by the public, can qualify as an entity's 'identity,' thereby giving rise to a protectable interest"); *Board of Trustees v. BAMA-Werke Curt Baumann*, 231 USPQ 408, 411 (TTAB 1986) (BAMA well-known as University's nickname such that "use by respondent of the identical term appropriates petitioner's identity"); *see also Jewelers Vigilance*, 2 USPQ2d at 2024 ("These allegations [under Sections 2(a) and 2(d)] demonstrate a real interest in

---

[29] 91 TTABVUE 6.

[30] *Id.*

the outcome of the proceeding based on a likelihood of confusion with the DeBeers' trade name."); *cf. Martahus v. Video Duplication Servs. Inc.*, 3 F.3d 417, 27 USPQ2d 1846, 1850-51 (Fed. Cir. 1993) ("a trade name lacking any independent trademark or service mark significance may bar registration [under Section 2(d)] of a trademark or service mark that is confusingly similar to that trade name") (*cited in W. Fla. Seafood, Inc. v. Jet Rests., Inc.*, 31 F.3d 1122, 31 USPQ2d 1660, 1665 (Fed. Cir. 1994)); *In re Kent Pedersen*, 109 USPQ2d 1185 (TTAB 2013) (application for LAKOTA falsely suggested a connection with a historic people who speak the Lakota language and share a common culture).[31]

The record supports Opposer's contention that New Cingular uses the term "Cingular" in its trade name. David Toti, Vice President of Financial Operations for AT&T Services, Inc., testified that New Cingular "holds over 8,000 active Federal Communications Commission ('FCC') wireless licenses, 20 wireless spectrum leases, and 270 active antenna structure registrations that are used in AT&T's wireless business." New Cingular "typically earns billions of dollars in net income each year," and incurred marketing expenses in the millions of dollars in 2014.[32]

Examples of New Cingular's licenses, contracts, and leases were attached to the declaration of George T. Graves, Opposer's counsel.[33] These include:

---

[31] In this regard, we disagree with Applicant that "direct competitors in an industry would only have a cognizable interest when the mark sought to be registered is generic, merely descriptive or functional." 154 TTABVUE 40.

[32] 96 TTABVUE 4. Confidential balance sheets for the years 2012 to 2017 attached to his declaration in support of this statement at 98 TTABVUE. Because the figures are confidential, we discuss them only in general terms.

[33] 79 TTABVUE.

- **Exhibit 36** – Agenda Report from the city council of Encinitas, California regarding an amendment to the city's lease agreement with New Cingular for "cellular communications purposes;"[34]

- **Exhibit 38** – an application to the State of Connecticut for a "Certificate of Environmental Compatibility and Public Need" filed by New Cingular for the construction, maintenance and operation of a telecommunications tower facility in the city of Glastonbury;[35]

  - New Cingular is identified in the application as "New Cingular Wireless PCS, LLC ('AT&T')"

- **Exhibit 40** – a proposal for a cellular tower facility presented to the "New Canaan Planning Commission;"[36]

  - The first slide of this presentation is headed:



New Cingular Wireless PCS, LLC
AT&T

- **Exhibit 46** – a copy of the City of Maryland Heights, Missouri's City Planner's Report regarding New Cingular Wireless PCS, LLC's proposal to install a 110 foot cell site;[37]

  - The City Planner's Report is titled "New Cingular Wireless/Application CUP13-0019" and reads, in part: "New Cingular Wireless now proposes to install a 110 foot light standard capable of accommodating wireless communication antennas...."

---

[34] 80 TTABVUE 963.

[35] 80 TTABVUE 1049-1082.

[36] 80 TTABVUE 1103-1133.

[37] 81 TTABVUE 34.

- **Exhibit 56** – a copy of an AT&T Installment Contract Privacy Notice for AT&T Next Installment Agreements;[38]

    - Mid-way down the page, is the query "Who is providing this notice?" and the answer: "As used in this notice, 'AT&T Mobility' refers to New Cingular Wireless PCS, LLC d/b/a AT&T Mobility and AT&T Mobility Next Operations LLC."

- **Exhibit 60** – a copy of AT&T's Retail Installment Agreement for its AT&T Next program;[39]

    - The "Seller/Creditor" is listed as "New Cingular Wireless PCS, LLC d/b/a AT&T Mobility"

    - The signatories to the agreement are the individual buyer and "New Cingular Wireless PCS, LLC d/b/a/ AT&T Mobility" and

- **Exhibit 67** – a copy of a Petition for Reconsideration of Cancellation of Microwave License WQSR845.

    - The petition is filed by "New Cingular Wireless PCS, LLC ('AT&T')"[40]

Applicant argues that New Cingular uses the name "New Cingular Wireless PCS, LLC" in "dense legal contracts and FCC tower leases and licenses"[41] and that its "public-facing"[42] business with wireless retail customers is conducted only under the assumed name AT&T Mobility. We do not define "public" so narrowly. The contracts, leases, and licenses at issue here, such as those set forth above, are in the wireless

---

[38] 81 TTABVUE 833-34.

[39] 82 TTABVUE 19-24.

[40] 82 TTABVUE 61.

[41] 154 TTABVUE 31.

[42] 154 TTABVUE 40.

communications field, where Opposer and Applicant are would-be competitors.[43] The name appears, in some cases prominently, on contracts or licenses. It would be viewed by those with whom New Cingular has entered into these agreements, such as professionals interested in the construction of cell towers as well as retail consumers purchasing cell phone wireless services under the AT&T Next program.[44] *Cf. W. Fla. Seafood*, 31 USPQ2d at 1664 (finding use of trade name in regulatory licenses probative of use of mark in association with restaurant services); *Nat'l Cable*, 19 USPQ2d at 1428 (use of trade name for plaintiff organization "within the titles and text of articles in its publications and in correspondence" sufficient to show use as a trade name). The above evidence shows that New Cingular conducts significant business in wireless communications using the trade name "New Cingular Wireless PCS, LLC." Therefore, we find that New Cingular uses CINGULAR as part of its trade name, and that the trade name is known to the relevant public.

2.  Does New Cingular's use establish Opposer's standing?

Opposer introduced the confidential[45] testimony of Charles M. Nalbone, Assistant Vice President - Senior Legal Counsel for AT&T Services, Inc.[46] He described AT&T Services, Inc. as "a subsidiary of AT&T Inc.," which, in turn, is "the parent company

---

[43] Applicant's sole member, Mark Thomann, also testified that Applicant sold or intended to sell digital calling cards under its marks. 128 TTABVUE 28.

[44] The "AT&T Installment Contract Privacy Notice for AT&T Next Installment Agreements" and the "Retail Installment Agreement" for the AT&T Next program are both located on AT&T's website at https://www.att.com/legal/terms. Graves Decl., 79 TTABVUE 10 and 12, Exhibits 56 and 60.

[45] We do not include confidential testimony or evidence herein.

[46] 91 TTABVUE 2; confidential version at 92 TTABVUE.

of Opposer AT&T Mobility LLC."[47] He testified to the following timeline to explain

the corporate relationship between Opposer and New Cingular Wireless PCS, LLC:

- In 2000, Cingular Wireless LLC was formed as a joint venture between Bell South Corporation and SBC Communications Inc.[48]

- In 2004, Cingular Wireless LLC acquired AT&T Wireless Services, Inc. and its operating entity AT&T Wireless PCS, Inc. [sic, LLC].[49]

  - This triggered a reorganization of the structure of Cingular Wireless LLC, which resulted in the continuation of Cingular Wireless LLC (as the holding company) and formation of Cingular Wireless II, LLC (CWII) (as its indirect subsidiary).

  - "At or about the same time, AT&T Wireless PCS, LLC changed its name to New Cingular Wireless PCS, LLC" (New Cingular).[50] New Cingular was owned 100% by CWII.

- In 2005, SBC Communications Inc. became AT&T Inc., which in 2006 acquired Bell South Corporation.[51]

  - "As part of that acquisition, AT&T Inc. obtained a 100% interest in Cingular Wireless LLC through direct and indirect ownership. Cingular Wireless LLC maintained its controlling interest in [CWII], while [CWII] was still the sole member of New Cingular."[52]

---

[47] 91 TTABVUE 2.

[48] 91 TTABVUE 5.

[49] 91 TTABVUE 6.

[50] 91 TTABVUE 6. *See also* 88 TTABVUE 20, Exhibit 86 (certification from the Delaware Secretary of State, certifying that the name change occurred on October 26, 2004).

[51] 91 TTABVUE 6.

[52] 91 TTABVUE 6.

- In 2007, Cingular Wireless LLC changed its name to AT&T Mobility LLC (Opposer).[53] CWII changed its name to AT&T Mobility II, LLC.[54] New Cingular did not change its name.[55]

Based on the above, Mr. Nalbone testifies that "[a]t the time of the commencement of this opposition proceeding, Opposer had approximately a 53.53% interest in AT&T Mobility II LLC [formerly CWII], with the remaining ownership interest belonging to other subsidiaries of AT&T Inc."[56] Because CWII (now AT&T Mobility II LLC) remained the sole member of New Cingular, Opposer argues that any harm that would be caused to New Cingular would flow to Opposer.

The parent corporation of a wholly owned subsidiary "can reasonably believe that damage to the subsidiary will naturally lead to financial injury to itself." *Univ. Oil Prods. Co. v. Rexall Drug & Chem. Co.*, 463 F.2d 1122, 174 USPQ 458, 459 (CCPA 1972) (a parent company has standing to file an opposition on behalf of its wholly-owned subsidiary because it can "reasonably believe that damage to the subsidiary will naturally lead to financial injury to itself," noting that "control over the mark or name relied upon is not determinative of standing to oppose"); *see also British-Am. Tobacco Co. v. Philip Morris Inc.*, 55 USPQ2d 1585, 1591 (TTAB 2000) ("Because petitioners allege that TISA is BATCo's wholly owned subsidiary, we find that petitioners have alleged a sufficient commercial interest by BATCo in this proceeding for us to conclude that the petition contains an acceptable assertion of BATCo's

---

[53] 91 TTABVUE 7.

[54] 91 TTABVUE 7. The company shortly after formation dropped the comma from its name. *Id.*

[55] *Id.*

[56] 91 TTABVUE 4.

standing."); *cf. Jewelers Vigilance*, 2 USPQ2d at 2024 ("There is no question that a trade association, having a real interest in the outcome of the proceedings, may maintain an opposition without proprietary rights in a mark or without asserting that it has a right or has an interest in using the alleged mark sought to be registered by an applicant.").

To prove that AT&T Mobility II LLC is partially owned by Opposer and that AT&T Mobility II LLC is the sole member of New Cingular, attached to the Nalbone declaration are:

- Exhibit 80 – "a true and correct copy of SCHEDULE A-MEMBERS to the First Amendment to the Third Amended and Restated Limited Liability Agreement of AT&T Mobility II LLC, which lists those ownership interests;"[57]

- Exhibit 86 – "a true and correct copy of a certification from the Delaware Secretary of State, issued on February 15, 2005, certifying that [AT&T Wireless PCS, LLC changed its name to New Cingular Wireless PCS, LLC] on October 26, 2004;"[58]

- Exhibit 82 – "a true and correct copy of the First Amendment to the Amended and Restated Limited Liability Company Operating Agreement of New Cingular Wireless PCS, LLC, dated October 27, 2004, which documents Cingular Wireless II, Inc.'s acquisition of all membership interests in New Cingular Wireless PCS, LLC;"[59]

- Exhibit 78 – "a true and correct copy of a certification of the name change issued by the Secretary of State for the State of Delaware on January 11, 2007," certifying Cingular Wireless LLC's name change to AT&T Mobility LLC;[60]

- Exhibit 84 – "a true and correct copy of the Certificate of Amendment to Certificate of Formation of Cingular Wireless II, LLC," which

---

[57] 91 TTABVUE 4; Exhibit 80 at 88 TTABVUE 7.

[58] 91 TTABVUE 6; Exhibit 86 at 88 TTABVUE 20.

[59] 91 TTABVUE 6; Exhibit 82 at 88 TTABVUE 9.

[60] 91 TTABVUE 7; Exhibit 78 at 88 TTABVUE 5.

documents Cingular Wireless II LLC's change of name to AT&T Mobility II, LLC on April 20, 2007;[61]

- Exhibit 141 – "a true and correct copy of an Organization Chart that reflects the organization structure of Opposer and its subsidiaries as of December 31, 2007;"[62]

- Exhibit 142 – "a true and correct copy of an Organization Chart maintained by Opposer and its affiliates that reflects the organizational structure of the mobility business of AT&T as of December 31, 2014;"[63] and

- Exhibit 138 – "a graphical representation of Opposer's organizational structure [as] of the filing date of this Opposition proceeding."[64] A simplified version of Opposer's relevant corporate structure is shown below:



Opposer has shown that it owns a majority interest in AT&T Mobility II LLC, which owns a 100% interest in New Cingular. Accordingly, Opposer has established the necessary relationship to New Cingular such that it "can reasonably believe that

---

[61] 91 TTABVUE 7; Exhibit 84 at 88 TTABVUE 16.

[62] 91 TTABVUE 7; Exhibit 141 at 93 TTABVUE 5 (confidential).

[63] 91 TTABVUE 4; Exhibit 142 at 93 TTABVUE 6 (confidential).

[64] 91 TTABVUE 5; Exhibit 138 at 93 TTABVUE 2 (confidential).

damage to the subsidiary will naturally lead to financial injury to itself." *Univ. Oil,* 174 USQP at 459.

Applicant argues that "despite repeated admonitions by the Board about Opposer having too 'tenuous' a theory of personal standing," Opposer once again did not provide testimony from New Cingular or from any of its own officers, directors, or employees.[65] The difference between this and earlier testimony is that the latter was unsupported by documentary evidence. In the prior decisions, the Board found that the AT&T entities that employed Opposer's previous declarants "ha[d] not demonstrated any interest in Opposer"[66] and the record was unclear about the nature of their corporate relationship to Opposer ("as either a sister corporation, a partially owned subsidiary, or both"[67]). Moreover, none of the previous declarants worked for Opposer or New Cingular with the exception of Joanne Todaro (identified as Opposer's Manager),[68] whose declaration was unclear as to whether "New Cingular Wireless PCS, LLC did business as CINGULAR or 'traded' as CINGULAR."[69]

Here, Mr. Nalbone is employed by AT&T, Inc., Opposer's parent company, making clear his employer's interest in Opposer, and his declaration is supported by documentary evidence demonstrating the nature of the corporate relationship between Opposer and New Cingular. Mr. Nalbone's testimony and the documentary record evidence draw a clear nexus between Opposer and New Cingular. Opposer's

---

[65] 154 TTABVUE 8.

[66] 37 TTABVUE 4.

[67] 58 TTABVUE 8.

[68] 53 TTABVUE 28.

[69] 58 TTABVUE 9.

reasonable belief that it may be harmed by Applicant's registration of the mark CINGULAR in light of Opposer's corporate relationship with New Cingular gives rise to a real and direct interest in this proceeding.

### B. Summary

In the discussion above, we found that New Cingular uses "Cingular" as part of its trade name. We now find the record demonstrates that Opposer is the owner of a majority share in a company named AT&T Mobility II LLC, which in turn holds a 100% interest in New Cingular, which uses the term CINGULAR in its trade name. Through this proven relationship, Opposer has established its standing to pursue its claim that Applicant's use of the mark falsely suggests a connection with Opposer. 15 U.S.C. § 1052(a).

## V.  CONCLUSION

Because we find that New Cingular uses the term CINGULAR in its trade name and conducts business in the field of wireless communications, Opposer's standing is confirmed by the proof of its corporate relationship to New Cingular, as described above. Opposer has shown a real interest in the outcome of this proceeding and a reasonable basis for its belief of damage thereby, and we need not reach Opposer's alternative bases for finding standing. This case will proceed to trial on the substantive issues herein.[70] "Notwithstanding our ruling on [O]pposer's standing to

---

[70] As the issue of standing is jurisdictional in nature, our determination that Opposer has standing is not a final adjudication of the merits and is not appealable. *See* Trademark Board Manual of Procedure (TBMP) § 901.02(a) (2019) ("The only type of Board decision that may be appealed…is a final decision, i.e., a final dispositive ruling that ends litigation on the merits before the Board.").

proceed in this case, [O]pposer may, of course, be precluded from prevailing herein." *Estate of Biro*, 18 USPQ2d at 1385-86.

**Decision:** Opposer has standing to bring this opposition against registration of the marks shown in Application Serial Nos. 86179822 (CINGULAR) and 86223138 (CINGULAR WIRELESS and design).[71]

## VI.   TRIAL SCHEDULE

As per the parties' joint motion to bifurcate proceedings, approved by the Board at 60 TTABVUE, this proceeding now enters Phase Two. During Phase Two, the parties need not resubmit any evidence previously submitted for Phase One; duplicate copies should not be filed. **In referring to any previously submitted testimony or documentary evidence, the parties shall identify all materials using their TTABVUE docket entry and page numbers.**

In anticipation of a voluminous record, each party is ordered to prepare and file an appendix to its brief of all testimony (such as an affidavit, declaration, or deposition transcript) and documentary evidence (such as exhibits to testimony or notices of reliance) specifying (1) the relevance of such evidence, and (2) where in the record such evidence may be found, **using the TTABVUE docket entry and page numbers** where the particular evidentiary item appears.[72] Each party will prepare the appendix for whatever evidence it has submitted, and attach same to their main briefs. The appendices are not included within the page limits of the briefs.

---

[71] Opposer is reminded that it must maintain its standing throughout the proceeding; however, unless Opposer's status changes, standing is not at issue for a determination on the merits of Opposer's claims.

[72] The parties may, for their convenience, include, but not substitute, Bates Nos.

Following is a sample of how an appendix would be headed:

| Source | Relevance | TTABVUE Entry/Page No. | Bates No. |
|---|---|---|---|
|  |  |  |  |

The parties are further required to add electronic "bookmarks" to any testimony or other evidence they intend to file as a .pdf document, prior to filing it through ESTTA, the Board's electronic filing system. Each document should include bookmarks to all exhibits, at the point where the exhibit is identified, and identify the exhibit in the bookmark by an alpha-numeric designation (not by Bates number) such as A,B,C, etc. or 1,2,3, etc. This will enable Board personnel to navigate quickly to the location of each exhibit. Best practice: use a separator page for each exhibit, and select that page for placement of the bookmark.[73]

The parties are reminded to limit the "confidential" designation only to information that is truly confidential or commercially sensitive. The Board may treat as not confidential that material which cannot reasonably be considered confidential, notwithstanding a designation as such by a party. Trademark Rule 2.116(g), 37 C.F.R. § 2.116(g); *see RxD Media, LLC v. IP Application Dev. LLC*, 125 USPQ2d 1801, 1804 n.9 and 1806 nn. 13-15, 25 (TTAB 2018); *Edwards Lifesciences Corp. v. VigiLanz Corp.*, 94 USPQ2d 1399, 1402 (TTAB 2010).

As previously ordered by the Board at 58 TTABVUE, no further motions for summary judgment from either party will be entertained.

Phase Two discovery and trial dates are hereby set as follows:

---

[73] This requirement is prospective only and there is no requirement to re-file any previously submitted documents to add bookmarks to them.

| | |
|---|---|
| Expert Disclosures Due | March 31, 2020 |
| Discovery Closes | April 30, 2020 |
| Plaintiff's Pretrial Disclosures Due | June 14, 2020 |
| Plaintiff's 30-day Trial Period Ends | July 29, 2020 |
| Defendant's Pretrial Disclosures Due | August 13, 2020 |
| Defendant's 30-day Trial Period Ends | September 27, 2020 |
| Plaintiff's Rebuttal Disclosures Due | October 12, 2020 |
| Plaintiff's 15-day Rebuttal Period Ends | November 11, 2020 |
| BRIEFS SHALL BE DUE AS FOLLOWS: | |
| Plaintiff's Main Brief Due | January 10, 2021 |
| Defendant's Main Brief Due | February 9, 2021 |
| Plaintiff's Reply Brief Due | March 6, 2021 |

-o0o-